**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| OLD NATIONAL BANCORP, and | ) | |
| 1834 INVESTMENT ADVISORS CO., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. ___24 cv 12683___ |
| | ) | |
| MATTHEW BAPPERT, and | ) | |
| BMO BANK N.A., d/b/a | ) | |
| BMO Investment Services, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiffs, Old National Bancorp, successor-by-merger to First Midwest Bancorp, Inc. ("Old National" or "ONB") and 1834 Investment Advisors Co. ("1834" or the "Company"), for their Complaint against Defendants Matthew Bappert ("Bappert") and BMO Bank, N.A., d/b/a BMO Investment Services ("BMO"), respectfully state as follows:

**I. NATURE OF ACTION**

1.      This is a $40+ million raiding-and-recruiting and unfair competition action involving a former financial advisor who, at the behest of his new employer: (a) misappropriated Plaintiffs' confidential and trade secret information, and (b) is now using that information to unfairly compete against his former employer, all in violation of his contractual post-employment obligations.

2.      The restrictive covenants at issue in this case were ancillary to, and in consideration of, Bappert's receipt of an equity ownership interest in Old National's predecessor-in-interest, First Midwest Bank.  In exchange for shares of First Midwest common stock (which fully vested), Bappert agreed that he would protect the customer relationships and confidential client information belonging to his employer: the Company (a wholly-owned subsidiary of First Midwest).

3.      More specifically, Bappert agreed: (a) he would not contact, solicit, or accept business from the Company's clients for twelve months after termination of his employment; and (b) he would not use or

1

disclose the Company's "Confidential Information" for his own benefit, or for the benefit of anyone other than the Company.

4. In early November of 2024, Bappert suddenly resigned from 1834 and began working as a financial advisor at BMO, one of the Company's direct competitors. Almost immediately after he arrived, Bappert and BMO embarked upon a scheme to: (a) misappropriate confidential and trade secret information from the Company, and (b) use that information to contact, solicit, and accept business from the Company's clients – a direct violation of his post-employment restrictive covenants.

5. Unfortunately, Defendants' scheme has been successful, to the material detriment of Plaintiffs. Using Bappert's knowledge of 1834's confidential and trade secret information, Defendants were able to – and did – contact the Company's clients to solicit them to transfer management of their account assets to BMO. This was a direct violation of Bappert's contractual non-solicitation and non-disclosure obligations, as well as trade secret misappropriation.

6. Defendants' improper solicitations have also been successful, unfortunately. To date, several clients have left 1834 and transferred management of their account assets – valued at more than *$40,000,000* – to Bappert at BMO.

7. As a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered substantial damages, well in excess of $1.5 million, in an amount to be proven at trial. These damages continue to mount, as Defendants continue to engage in unfair competition.

8. By this action, Plaintiffs assert claims against Defendants for trade secret misappropriation, breach of contract, civil conspiracy, tortious interference, and unjust enrichment.

9. Plaintiffs also seek temporary, preliminary, and permanent injunctive relief to enjoin Defendants' continued misconduct giving rise to these claims.

## II. THE PARTIES

10. Plaintiff Old National Bancorp is a national banking institution organized under the laws of the state of Indiana, with headquarters and its principal place of business located in Evansville, Indiana.

2

11.     Plaintiff 1834 Investment Advisors Co. is a registered investment advisor ("RIA") firm organized under the laws of the state of Wisconsin, with its principal place of business located in Milwaukee, Wisconsin.

12.     Based upon information and belief, Defendant Matthew Bappert resides (and intends to remain) in Salem, Wisconsin and, as such, is domiciled in and a citizen of the state of Wisconsin.

13.     Based upon information and belief, BMO Bank, N.A., doing business as "BMO Investment Services," is a national bank, whose main office is located in Chicago, Illinois.

### III.  JURISDICTION AND VENUE

14.     This Court has original "federal question" jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), as Plaintiffs' trade secret misappropriation claims arise under, *inter alia*, the Defend Trade Secrets Act of 2016 (the "DTSA"), 18 U.S.C. § 1836(b)(1).

15.     This Court has supplemental jurisdiction over the Illinois common law and statutory claims alleged in this Complaint because those claims arise out of the same nexus of operative facts as Plaintiffs' claims under the DTSA, such that they "form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district.

### IV.  FACTUAL BACKGROUND

#### A.     OLD NATIONAL AND 1834

17.     From its headquarters in Milwaukee, Wisconsin, 1834 provides wealth management and investment advisory services – including portfolio assessment, asset allocation, financial planning, and portfolio management – to a select group of high-net-worth clients throughout the United States (including, but not limited to: Arizona, Illinois, Indiana, Michigan, Minnesota, Missouri, Tennessee, and Wisconsin).

18.     1834 is a wholly-owned subsidiary of Old National.  The Company was founded in December of 1975 (as "W.A. Haker Investment Management, Inc."), and has been providing wealth management and investment advisory services to its clients for nearly fifty (50) years.

3

19.     Eventually, it changed its name to Northern Oak Capital Management, Inc.  On or about May 16, 2013, the Company again changed its corporate name from Northern Oak Capital Management, Inc. to Northern Oak Wealth Management, Inc., but continued to be colloquially known as "Northern Oak."

20.     In January of 2019, Northern Oak was acquired by, and became a wholly-owned subsidiary of, First Midwest Bancorp, Inc. ("First Midwest"), a national banking institution with its principal place of business located in Chicago, Illinois.

21.     On or about February 16, 2022, First Midwest and Old National merged into one entity, with Old National becoming the resulting bank holding company.  As a result of the merger, 1834 became a wholly-owned subsidiary of Old National.

22.     In November of 2022, Old National re-branded its wealth management division, and Northern Oak changed its corporate name to its current iteration, "1834 Investment Advisors Co."

### B.     1834'S CONFIDENTIAL INFORMATION

23.     Because of its status as an RIA (registered as such with the SEC), 1834 and anyone employed as a financial professional at the Company owe heighted fiduciary duties to their clients.  In furtherance of those fiduciary duties, the SEC has promulgated rules and regulations concerning, *inter alia*, the handling and protection of client information.  In particular, SEC Regulation S-P requires the Company (and every RIA) to develop, implement, and maintain written policies and procedures that address administrative, technical, and physical safeguards for the protection of client information.  In compliance with these regulations, the Company has developed, implemented, and maintains written policies and procedures that are designed to, *inter alia*:

     a.     Ensure the security and confidentiality of client information;

     b.     Protect against any anticipated threats or hazards to the security or integrity of client information; and

     c.     Protect against unauthorized access to, or use of, client information that could result in substantial harm or inconvenience to any Company client.

24.     These written policies and procedures reflect the Company's deep concern for the protection of client information. 1834's disclosure statement to clients expressly provides, for instance, that

the Company "does not share [personal information] with nonaffiliates so they can market to you." Similarly, 1834's Compliance Manual provides that its investment advisory representatives are prohibited from "[d]isclosing information about a client and his or her account to persons outside the Company without the client's approval." It also provides that "[t]he Firm will keep the financial affairs of its clients confidential" and to do so, it will "[p]rohibit any employee from disclosing to others the name of the clients of the Company and their securities holdings."

25. As part of its normal business practices, 1834 develops, keeps, and maintains information about its clients – individually and in the aggregate – that is highly confidential and proprietary to the Company ("Confidential Information"). 1834's Confidential Information includes, but is not limited to, the following:

    a. The names and identifying information of Company clients, including each client's status as:

        i. a financial services customer *generally* (i.e., a person or entity who needs, wants to receive, or has previously received wealth management, investment advisory, or similar financial services), and

        ii. a current or former client of the Company *specifically*;

    b. The contact information of Company clients, including their mailing addresses, email addresses, and telephone numbers;

    c. Personal identification information about clients, such as their birthdays, social security numbers, and names of family members;

    d. Client business and financial information, including:

        i. information about their accounts, such as: account numbers, balances, investment holdings, transaction information (such as purchases, sales, deposits, withdrawals, or transfers), signatories, and beneficiaries;

        ii. information about their investment strategies, goals, preferences, risk tolerances, and account history;

        iii. information about their financial needs, plans, and income;

        iv. portfolio and asset management plans, methods, strategies, and fee structures; and

    e. Client lists and other compilations – in whole or in part – of the information set forth in (a)-(d), above.

26.     1834's Confidential Information was developed over a substantial period of time, and at great expense to the Company.  Indeed, the vast majority of 1834's Confidential Information took several years (often *decades*) and hundreds of thousands of dollars to obtain and compile.

27.     The Company derives substantial economic value from its Confidential Information.  The information is invaluable in its own right; it is literally the "lifeblood" of 1834, and the Company could not operate (or even exist) without it.

28.     Equally important, the Company's Confidential Information also derives substantial economic value from its confidentiality; the information is valuable *precisely because* it is available only to 1834, and is not generally known by other firms in the highly competitive financial services industry.

29.     1834's Confidential Information would be of tremendous value to the Company's competitors, who could use it to unfairly poach Company clients.  For example:

a.     The information would allow a competitor to *immediately* identify persons who, by virtue of their status as clients of 1834, are already known to be high-net-worth individuals who utilize wealth management and investment advisory services.  The competitor would be spared the significant costs – both temporal and monetary – that 1834 incurred to develop this information.

b.     With knowledge of the client's contact information, the competitor could send targeted solicitations (often characterized in the industry as "announcements") directly to these high-net-worth individuals.

c.     Armed with foreknowledge of the client's financial goals, risk tolerances, investment strategies, and fee structure, the competitor could: (i) perfectly tailor their marketing efforts for each individual client; and (ii) undercut 1834's management fees.

30.     In addition to its written compliance policies and procedures, 1834 has also developed, implemented, and maintains security measures to safeguard its Confidential Information.   More specifically:

a.     All of the Company's computers, networks, and information accounts are password protected.  Users are required to regularly change their passwords, and remote access is restricted (and, where permitted, requires dual-factor authentication).

b.     Computer, network, and email activity is closely monitored.  The Company utilizes electronic safeguards that automatically flag any employee who attempts to forward an email message to their personal account, or who tries to download information or

files to an electronic storage device (e.g., USB "flash drive") or cloud-based storage account (e.g., "Dropbox," "Google Drive," etc.).

c.   All Company office locations are equipped with automatic locks requiring "keycard" access, and are monitored via 24-hour video surveillance.

d.   All employees who might have access to Confidential Information are required, as a condition of their employment, to execute standardized agreements containing confidentiality and non-disclosure covenants, which prohibit the employee from, *inter alia*, doing any of the following at any time during the period of their employment with the Company and at all times after termination of their employment (for any reason):

  i.   Using or disclosing, directly or indirectly, any Confidential Information except in furtherance of the employee's duties and responsibilities in the ordinary course of their employment with the Company; or

  ii.  Using or disclosing, directly or indirectly, any Confidential Information for their personal benefit, or for the benefit of any party other than the Company or its subsidiaries or affiliates.

e.   Upon separation of employment (for any reason) employees are required to immediately return all Company property (including laptops, keycards, and any paper copies of files), and their ability to access any Company computers, networks, or information accounts is terminated.

31.   As a matter of practice and procedure, when a financial advisor's employment with 1834 is terminated (either voluntarily or involuntarily), the departing advisor is required to promptly return to the Company any and all documents and electronic files that constitute or contain Confidential Information. The Company also makes a point of reminding the departing advisor of their ongoing, post-employment contractual obligations to maintain the confidentiality of, and never use or disclose, any Confidential Information that they may have obtained or developed, or to which they may have otherwise been privy, during the course of their employment with the Company.

C.   **THE COMPANY'S CLIENT RELATIONSHIPS**

32.   The time, effort, and expense 1834 has devoted toward creating and maintaining (and maintaining the confidentiality of) its Confidential Information is congruent with the time, effort, and expense the Company devotes toward establishing and maintaining its client relationships.

33.   The Company's approach towards client development, and the nature of its wealth management and investment advisory services, is unique and specially-tailored to the individual needs of

each particular client. The substantial amount of time, effort, and expense that 1834 dedicates to client development has allowed the Company to establish client relationships that are "near-permanent." Many of 1834's clients are multi-generational, and have been with the Company for several decades; some have been clients for upwards of forty (40) years.

34. Moreover, 1834 requires its financial advisors to develop and maintain close personal connections with its clients. The Company's minimum acceptable standard for client engagement by a financial advisor is "once per quarter." Under this standard, every advisor is required to meet with each of their clients at least four times a year; successful advisors, however, typically engage with their clients several times each week, but rarely less frequently than "once per week." As a result, the Company's year-over-year client retention rate is in excess of 95%.

35. Financial advisors at 1834 are supported by a dedicated team of financial professionals, with various client-facing and back-office responsibilities. While each client is assigned a financial advisor who is ultimately responsible for the client relationship, 1834's clients frequently interact with administrative assistants, client service associates, wealth planners, and sometimes even compliance or operational directors. In addition, financial advisors at 1834 are encouraged to "cross-market" with service providers from the Company's affiliate, Old National Bank, such as tax advisors, estate planning professionals, mortgage consultants, and consumer bankers. As a result, 1834 is able to develop a deep and comprehensive understanding of each client and their particular needs, goals, and preferences. 1834's detailed knowledge of its clientele further contributes to the Company's 95% client retention rate.

36. Historically, when financial advisors at 1834 have separated their employment with the Company, the departing advisors have honored their post-employment restrictive covenants. More specifically, departing advisors: (a) have not used or disclosed 1834's Confidential Information; and (b) have, during the twelve-month period following the termination of their employment, refrained from (i) calling upon or otherwise contacting – including by way of "announcement" – the Company's clients, and (ii) soliciting or accepting any business from those clients.

37.    As a result, when departing financial advisors have honored their post-employment restrictions, the Company has experienced very little, if any, client attrition.

38.    For example, Robert Brooks is a financial advisor who previously worked at 1834.  On May 5, 2023, Mr. Books resigned from the Company to accept employment at Wealth Enhancement Advisory Services, LLC ("WEAS"), one of 1834's direct competitors.  As of today – more than eighteen (18) months after Mr. Brooks resigned – the Company knows of *only two (2) clients* who left 1834 to work with Mr. Brooks at WEAS.

39.    Similarly, Katherine L. Otis is a financial advisor who previously worked at 1834.  After her employment with the Company terminated on August 26, 2024, Ms. Otis accepted employment with Merrill, Lynch, Pierce, Fenner & Smith, Inc., one of the Company's direct competitors, in their Waukesha, Wisconsin branch office.  Since that time, not a single client – i.e., *zero (0) clients* – left the Company to follow Ms. Otis.

### D.    MATTHEW BAPPERT'S EMPLOYMENT

40.    In 2015, Northern Oak received a job application from Bappert.  Even though Bappert was new to the financial services industry, and had no prior experience as a financial advisor, Northern Oak decided to hire him so he could be properly trained by, and start his career in the financial services industry with, Northern Oak.

41.    On August 6, 2015, Northern Oak extended an offer of employment to Bappert.  Because his position at Northern Oak would require access to Confidential Information, Bappert's employment offer advised that he would be required to sign the Company's confidentiality and restrictive covenant agreement.

42.    Although Northern Oak's offices were located in Milwaukee, Wisconsin, Bappert was living in Chicago at the time he was seeking employment.  Accordingly, as an accommodation to Bappert, Northern Oak's employment offer stated that he could work remotely from Illinois until his apartment lease expired.  On August 12, 2015, Bappert accepted the Company's offer of employment and began his employment with the Company in Chicago.

43.    In consideration for his employment at Northern Oak and his receipt of the benefits of that employment (including, *inter alia*, access to the Company's Confidential Information), Bappert also executed Northern Oak's standardized Noncompetition, Confidentiality, and Indemnification Agreement ("NCIA") on August 12, 2015.

44.    The NCIA included a post-employment restrictive covenant that prohibited Bappert from, *inter alia*, communicating with, soliciting, or accepting business from Northern Oak clients for a period of twelve (12) months following the termination of his employment.  The NCIA also included a provision prohibiting Bappert from "disclos[ing] to any Competitor any Confidential Information or us[ing] any Confidential Information for his own use or for the use or advantage of any third-party Competitor…." (The NCIA defined a "Competitor" to mean "any person…or entity that provides…the same or similar services as [Northern Oak]").

45.    The NCIA also made clear that the agreement inured to the benefit of the Company's successors and assigns: "This Agreement shall inure to the benefit of [Northern Oak], its successors and assigns, including, without limitation, any entity or corporation which may acquire substantially all of [Northern Oak's] assets and business," such as First Midwest, "or into which [Northern Oak] may be consolidated or merged."

46.    When Bappert joined Northern Oak, he had no license or registration from the SEC, and was not able to provide wealth management or investment advisory services.  Accordingly, Northern Oak provided Bappert with training and course materials, along with paid time off to study for the "Series 65" Investment Advisers Law Exam, administered by FINRA (the Financial Industry Regulatory Authority). Northern Oak also covered Bappert's exam fee and, when he successfully passed the exam in January of 2016, the Company paid his CRD licensing and registration fees.

47.    In addition to his securities registration, Northern Oak provided Bappert with extensive training in the financial services industry.  As part of the benefits of his employment, Northern Oak taught Bappert portfolio analytics, stock research, financial planning, 401(k) plan analysis, marketing, portfolio

management, and product development – i.e., everything he needed to know in order to become a successful financial advisor – all at Northern Oak's expense.

48. Perhaps most importantly, Northern Oak provided Bappert with a book of business. Bappert did not have a single client when he started working at the Company. During the course of his employment, Northern Oak introduced Bappert to more than 200 relationships, and assigned him to manage certain client households – not for his own benefit, but for the benefit of his employer, Northern Oak. Many of these were client relationships that other financial advisors had nurtured and developed, which Northern Oak later re-assigned to Bappert. Other client relationships were developed via Northern Oak's participation in third-party client referral programs, such as the Schwab Advisor Network ("SAN") program and TD Ameritrade's "Advisor Direct" program (which merged into the SAN program following Charles Schwab's acquisition of TD Ameritrade in 2020), which the Company assigned to Bappert. (Northern Oak's participation in the SAN program proved cost-prohibitive, as the Company lost hundreds of thousands of dollars through solicitation fees and revenue sharing requirements).

49. To the extent Bappert ever developed a client relationship that wasn't handed to him by another advisor, it is important to remember that Bappert would have developed that relationship in his capacity as an employee of Northern Oak, for the benefit of his employer (Northern Oak), all while he receiving a salary from Northern Oak. Thus, unlike an experienced financial advisor who might join the Company and bring an established book of business with them, none of the client relationships that Bappert developed were "his" clients; rather, every one of those client relationships belongs to Northern Oak (now, 1834).

### E. BAPPERT IS GRANTED AN EQUITY OWNERSHIP INTEREST IN FIRST MIDWEST

50. Approximately two years after acquiring Northern Oak, First Midwest instituted an equity ownership program designed to retain key employees. Under that program, on February 17, 2021, Bappert was given the opportunity to receive an award of First Midwest common stock, which would become fully vested three years later, on February 17, 2024. The terms and conditions of the equity ownership award

were memorialized in a formal Stock Award Agreement (the "Award Agreement"), a true and correct copy of which is attached as **Exhibit A**.

51.     In consideration for his ownership interest in First Midwest, Bappert was required to accept certain "Confidentiality and Restrictive Covenants," as set forth in Paragraph 12 of the Award Agreement. (Ex. A, at pp. 5-8).  On April 5, 2021, Bappert executed the Award Agreement, thereby accepting the equity ownership interest in First Midwest, and agreeing to those restrictive covenants.  (*Id.*, p. 10).

52.     As expressly stated in the terms of the Award Agreement, the restrictive covenants in Section 12 inured to the benefit of First Midwest's subsidiaries and affiliates, which were collectively referred to as the "Affiliated Group."  (Ex. A, at p. 5, ¶ 12(a)).  Having been acquired by First Midwest in January of 2019, Northern Oak – Bappert's employer – was, thus, an intended third-party beneficiary of the "Confidentiality and Restrictive Covenants" set forth in Section 12 of the Award Agreement.  (*Id.*).

53.     Pursuant to those restrictive covenants, Bappert "acknowledged and agreed" that Northern Oak had "spent extensive time, effort and resources developing and maintaining personal contacts and relationships with clients," which Bappert had "knowledge of, access to, or contact or dealings with." Bappert further acknowledged and agreed that Northern Oak "has a legitimate and protectable interest in [its] clients," with whom the Company "has established significant business relationships."  (Ex. A, at p. 5, ¶ 12(a)).

54.     Bappert further acknowledged and agreed that, during the period of his employment with Northern Oak and at all times thereafter, he would be prohibited from using or disclosing the Company's "Confidential Information" for any purpose other than in furtherance of his duties as an employee of Northern Oak "in the ordinary course of business," and that he would not "directly or indirectly, use or disclose any Confidential Information for the benefit of a party other than [Northern Oak]."  Bappert further acknowledged and agreed that, as used in the Award Agreement, "Confidential Information" included "any and all trade secrets" and "confidential, proprietary or nonpublic information" about Northern Oak or "any of [its] clients or customers," including any "information or data" concerning Northern Oak or "any of [its] clients or customers."  (Ex. A, at pp. 5-6, ¶ 12(b)).

55.     In consideration for his equity ownership interest in First Midwest, Bappert further agreed that "for a period of twelve (12) consecutive months after the last day of [his] employment with [Northern Oak]," he would not "directly or indirectly" – whether for his "own account or as an employee, officer, director, owner, partner, representative, agent or consultant of any financial institution, bank…or other entity" – "solicit, call upon, contact, sell to, perform services for or contract with any clients or customers" of Northern Oak; nor would he "accept any business from any such client or customer, which business involves services or products of any kind that are offered or provided by [Northern Oak]."  (Ex. A, at pp. 6-7, ¶ 12(d)).

56.     Bappert further acknowledged and agreed that the non-solicitation restriction prohibited him from "providing the name or Confidential Information about a client or customer" of Northern Oak to his subsequent employers.  (Ex. A, at p. 7, ¶ 12(d)).

57.     Finally, Bappert acknowledged and agreed that the "Confidentiality and Restrictive Covenants" set forth in Paragraph 12 of the Award Agreement – including the non-disclosure, non-solicitation, and non-acceptance covenants in Paragraphs 12(b) and 12(d) – were "reasonable and necessary for the protection of [Northern Oak's] legitimate business interests, and do not impose any undue economic hardship on [him] or otherwise preclude [him] from gainful employment."  (Ex. A, at p. 8, ¶ 12(l)).

58.     In the event of any "actual breach or threatened breach of paragraph (12)" of the Award Agreement, Bappert agreed that First Midwest would be entitled to, *inter alia*, "injunctive relief against [him] to prevent any such actual or threatened breach without the necessity of posting a bond or other security."  (Ex. A, at p. 9, ¶ 14(c)).

59.     Moreover, by executing the Award Agreement, Bappert expressly authorized the Court to "blue-pencil" any restrictive covenant *if necessary* to allow the agreement to "be enforced to the fullest extent permitted by law" – specifically, the "laws of the State of Illinois."  (Ex. A, at p. 8, ¶¶ 12(i), 12(k)).

60.     By its terms, the "Award Agreement shall be binding upon, and inure to the benefit of, any successor or assignee" of First Midwest.  (Ex. A, at p. 4, ¶ 10).  Thus, upon (and by virtue of) the February

16, 2022, merger transaction, Old National, as successor-by-merger, assumed all rights and obligations under the Award Agreement with Bappert.

      **F.**    **BAPPERT SUDDENLY QUITS**

      61.    On Monday, October 21, 2024, Bappert called David Becker, the Senior Managing Director of 1834, and informed Becker that he was resigning from 1834. Bappert noted that it was "customary" to provide two weeks' notice, and asked Becker if he wanted Bappert to stay through November 4, 2024. Becker was surprised by the resignation and so told Bappert he would think through the logistics of the resignation and let him know.

      62.    The next morning, on October 22, 2024, while Becker was still away from the office and not yet able to consider a potential transition plan for his two-week notice period, Bappert came into 1834's office, dropped off his Company-issued laptop, and left. Consistent with standard procedures, a member of the Company's human resources department reminded Bappert of his ongoing contractual obligations regarding clients and Confidential Information.

      63.    A few days later – despite the fact that he effectively abandoned his job and refused to assist with the transitioning of client files – Bappert had the audacity to demand that 1834 keep him on the Company's payroll so that he would continue receiving his salary and health insurance benefits through November 4, 2024. In recognition of the nearly ten years that Bappert worked at the Company, and with the expectation that he would honor his contractual obligations and not contact, solicit, or accept business from any clients for the next twelve months, the Company agreed to his request. Thus, while Bappert's effective date of resignation was October 22, 2024, he remained employed by 1834 through November 4, 2024.

      64.    After his resignation, 1834 learned that Bappert passed his FINRA "Series 63" exam on August 12, 2024. Given the fact that 1834 did not ask Bappert to take this exam (nor was the Company even aware that he obtained this license), it seems clear that Bappert was preparing to leave the Company several months before he resigned. Bappert also used the Company's card to pay for his annual CFP

certification fee on September 4, 2024, despite knowing his 2024-2025 certification would only benefit his future employer, and not the Company.

65.     Like most RIA's and financial service firms, 1834 generally tracks its assets-under-management ("AUM") according to client "households," as opposed to individual people or accounts. Thus, for example, a married couple may each have several different investment accounts (e.g., multiple separate IRA accounts, various joint accounts, one or more family trust accounts, several 529 plans for their various children, etc.); for purposes of tracking AUM, the Company would group together all those accounts into a single "client household."  As of the date of Bappert's resignation:

      a.     1834's total AUM (firmwide) was approximately $1.1 billion;

      b.     Bappert was the assigned financial advisor to 211 client households; and

      c.     The 211 households assigned to Bappert represented a total aggregate AUM of $394,000,000 – approximately 35.8% of the Company's AUM.

66.     Historically, the 211 client households assigned to Bappert would generate approximately $2.3 million in annual revenue (via account management fees) for the Company.

67.     Most of the clients Bappert serviced at 1834 have been clients at the Company for years; indeed, some have been with the Company for nearly 40 years.  Regarding the 211 client households assigned to Bappert, on the effective date of his resignation:

      a.     At least ninety (90) were clients at Northern Oak **_before_** Bappert joined the firm; obviously, he played no part in developing any of those client relationships.  Those households represent approximately $191,000,000 in AUM – approximately 48.5% of the total AUM managed by Bappert at the time of his resignation.

      b.     Approximately 59% of client households with $3M+ in AUM were clients at Northern Oak before Bappert joined the firm.

      c.     More than $323,000,000 of the AUM assigned to Bappert (more than 82% of his total AUM) belonged to households who have been clients at 1834 for more than five (5) years.

      d.     More than 40% of the client households assigned to Bappert have been clients at 1834 for more than ten (10) years, and nearly 10% of the households assigned to him have been clients for more than twenty (20) years.

e.    Only five (5) households – representing less than 2.2% of the AUM managed by Bappert – have been with the Company for less than a year.

**G.    BAPPERT <u>ADMITS</u> TO BREACHING THE AWARD AGREEMENT**

68.    On or about November 4, 2024, Bappert began working as a financial advisor at one of the Company's direct competitors: BMO Investment Services – the brand name used by certain employees of BMO Bank N.A. (previously defined as "BMO") who provide advisory, brokerage, and insurance services offered through LPL Financial.

69.    In mid-November 2024, the Company received word that Bappert may have contacted several of the clients that he formerly serviced at 1834 in an effort to solicit their business and induce them to transfer management of their account assets to BMO. Not only would Bappert's behavior constitute a violation of his contractual post-employment obligations to Old National under the Award Agreement, but he could not have accomplished this task without misappropriating 1834's Confidential Information.

70.    Accordingly, on November 15, 2024, Old National's in-house counsel sent a "Notice to Cease and Desist" to Bappert (with a copy to BMO), demanding that he immediately stop using and/or disclosing the Company's Confidential Information, and stop contacting and soliciting the clients he previously serviced at 1834. A true and correct copy of the Notice to Cease and Desist is attached as **<u>Exhibit B.</u>**

71.    On November 19, 2024, Old National received a response from BMO's legal counsel, Andrew Schulkin. In this email message – a true and correct copy of which is included within the (redacted) email chain attached hereto as **<u>Exhibit C</u>** – Mr. Schulkin represented, *inter alia*, that:

a.    "Mr. Bappert is aware of his legal obligations to Old National and plans to comply with them."

b.    Bappert "has not solicited any Old National clients or employees and has not shared any trade secrets with BMO."

c.    Bappert "sent announcement notices to a small number of clients that he worked with at Old National so that they can contact him about their accounts if needed and so that he is in compliance with his obligations as a Certified Financial Planner…."

d.    Bappert "is not going to contact any Old National customers during the remainder of his 12-month non-solicitation period."

16

72.     In other words, in his November 19ᵗʰ email correspondence, BMO's counsel admitted that Bappert has breached the post-employment restrictive covenants in his Award Agreement with Old National, pursuant to which Bappert agreed not to "solicit," "call upon," or "contact" any of the Company's clients prior to November 4, 2025 (twelve months following the termination of his employment with 1834).

73.     Mr. Schulkin also admitted Bappert sent announcement notices to clients, yet claimed Bappert did not share any trade secrets with BMO.  By using the identities and contact information of 1834 clients (as well as his knowledge of their *status as a client* of 1834) to contact those clients on BMO's behalf, Bappert necessarily disclosed 1834's trade secrets to BMO.  (Mr. Schulkin's suggestion that Bappert "has not solicited" clients is similarly misplaced; the act of sending an announcement notice to 1834's clients constitutes "solicitation" in-and-of itself).

74.     On November 22, 2024, Mr. Schulkin advised counsel for Old National that Bappert had retained separate legal counsel, Jacob Bradley.  Four days later, on November 26, 2024, Mr. Bradley wrote that he was getting "up to speed" on the issues raised in Old National's cease-and-desist letter, and asked to schedule a call for November 27, 2024.

75.     On the morning of Wednesday, November 27, 2024, Old National's counsel sent an email to Mr. Bradley informing him that the Company had suffered a loss in that at least one client transferred their business to BMO; accordingly, he requested information about Bappert's communications (sent and received) from the Company's clients.

76.     Later that afternoon, Bappert's counsel rejected Old National's request for information, stating only that Bappert "used public sources to locate contact information for 33 people to whom he sent an announcement."  (Ex. C).

**H.     BAPPERT HAS TAKEN 1834'S CLIENTS TO BMO AND PERSISTS IN DOING SO**

77.     The Company has learned that several of its clients have left 1834 and transferred management of their account assets to Bappert at BMO – a violation of the non-acceptance covenant in his Award Agreement with Old National.

78.    On November 21, 2024, the Company was notified that one client household, with an AUM of approximately $1.2 million ("Client C&J.B."), was terminating their relationship with 1834 and transferring management of their assets to Bappert at BMO. Client C.&J.B. had been a client of 1834 since March of 2015, before Bappert even joined the firm.

79.    On November 27, 2024, the Company received a telephone call from another client, with an AUM of approximately $33 million ("Client T&K.S."), providing notice that he was going to continue working with Bappert at BMO. The next day, 1834 received an Automated Customer Account Transfer ("ACAT") notice confirming the client had transferred management of all their accounts to BMO. The loss of this particular client is notable for several reasons:

   a.    Client T&K.S. had been with 1834 for more than five years (since July 2019), and it is atypical for the Company to lose a client relationship of that duration.

   b.    Bappert was not involved in the development of this client relationship. Client T&K.S. came from a trusted and longstanding referral source, who has been working with 1834 for at least fifteen (15) years. When 1834 is unable to retain a client referral, the Company's reputation with the referral source always suffers (particularly when the referral was an ultra-high-net-worth client, with more than $33 million in AUM).

   c.    On November 21, 2024, 1834 employees spoke with Client T&K.S., and received assurances that the client's relationship with 1834 was on solid footing. Yet, just one week later, the client transferred management of their entire portfolio to BMO.

   d.    Client T&K.S. had approximately $33 million in AUM with 1834, which represented more than 8% of the total AUM assigned to Bappert, and more than 3% of the fee revenue for the entire firm.

80.    The Company later learned that three additional client households previously assigned to Bappert terminated their relationship with 1834 and transferred their assets to BMO's asset custodian:

   a.    One household, representing $801,000 in AUM – "Client M&L.T." – had been with 1834 since 2012 (several years before Bappert joined the firm).

   b.    Another household, representing $453,000 in AUM – "Client C&M.H." – had been with 1834 since 2022.

   c.    A third household, representing $4,800,000 in AUM – "Client S.W." – had been with 1834 since 2011 (several years before Bappert joined the firm).

81.     Contrary to the assurances the Company received – i.e., that Bappert's communications with 1834's clients: (a) occurred only via written announcement, and (b) have since stopped – on December 5, 2024, the Company learned from "Client E.S." (who has been a client of 1834 since February of 2010, and represents more than $1,200,000 in AUM) that she received a telephone call from Bappert shortly after he joined BMO, and that she had recently received a letter from BMO, which she had not yet opened.

### COUNT I
### VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT
### (Against Bappert and BMO)

82.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 81 of this Complaint, as and for this Paragraph 82.

83.     Defendants' actions, as described above, constitute violations of one or more provisions of the DTSA.  The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated … if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  The DTSA further provides that "a court may grant an injunction – to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable…."  18 U.S.C. § 1836(b)(3)(A).

84.     By engaging in the conduct described above, Defendants have misappropriated, threaten to misappropriate, or inevitably will misappropriate 1834's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.  For example, the trade secrets contain information about clients 1834 provided services to in several states (including clients located in, *inter alia*, Wisconsin, Indiana, Illinois, Michigan, Missouri, Minnesota, Arizona, and Tennessee).

85.     The trade secret information to which Bappert had access and which came into his possession includes, but is not limited to, financial information (customers' account information; customers' investment strategies, goals, and account history; portfolio and asset management plans, methods, and formulas developed for customers), business information (customers' contact information, their status as clients of 1834, and their financial needs, preferences, risk tolerances, income sources), and compilations of such information (customer lists).  These trade secrets are described in greater detail, *supra*.

86.     1834 is the owner of that trade secret information because it is the legal entity in which rightful legal or equitable title to the trade secrets are reposed, by virtue of, *inter alia*, customer account agreements, and financial services regulations (e.g., Regulation S-P) regarding the use, retention, and protection of confidential customer information.

87.     1834 expended substantial time, energy, money and ingenuity in compiling this information based on its own efforts and communications with clients, prospective clients, and others.

88.     The trade secrets derive independent economic value and benefit from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic benefit from the disclosure or use of the information by using such information to poach 1834's valuable clients.

89.     1834 has taken reasonable measures to keep this information secret.  As described more fully above, the Company has promulgated privacy and confidentiality policies, it has implemented both electronic and physical protections to keep the information secret, and it requires employees with access to the information to sign confidentiality agreements.

90.     1834 communicated these trade secrets to Bappert in confidence.

91.     As set forth above, Bappert (and BMO by virtue of its employment of Bappert and its actions of obtaining client information from him) misappropriated, threatens to misappropriate, or inevitably will misappropriate 1834's trade secrets by, among other thing, disclosing the identities of 1834's clients and their contact information to BMO, and then using that information to unfairly compete with 1834.  Bappert did so without the express or implied consent of the Company.

92.     At the time of his disclosure and use, Bappert: (a) knew that his knowledge of the trade secret information was acquired by him under circumstances giving rise to contractual and fiduciary duties to maintain the secrecy of the trade secret information and limit its use, and (b) his disclosure to BMO, or his use on his own accord or on behalf of BMO, constituted a breach of his contractual and fiduciary duties to maintain the secrecy of that confidential information, not disclose it to anyone other than Plaintiffs, and not use it for own benefit or for the benefit of any other person or entity (other than Plaintiffs).

20

93.     Bappert intended to convert, or inevitably will convert, the trade secrets to the economic benefit of himself and BMO, without 1834's consent, for use while at BMO.  Bappert and BMO can obtain economic value for the disclosure and use of 1834's trade secrets, for example, by utilizing the information therein to solicit, attempt to induce, and induce 1834's clients to switch their business from 1834 to BMO.

94.     BMO acquired, received and possesses, or inevitably will acquire, receive and possess, the trade secrets, knowing same to have been misappropriated without 1834's authorization and in violation of Bappert's contractual commitments and other legal duties to the Company.

95.     At the time BMO acquired the trade secret information from Bappert, BMO knew and/or had reason to know that Bappert's use and disclosure of that information to (and for the benefit of) BMO constitutes: (i) intellectual property theft by Bappert, (ii) a breach by Bappert of his contractual and fiduciary duties to Plaintiffs and their clients to maintain the secrecy of the information, and (iii) an inducement by BMO of Bappert's breach of his contractual and fiduciary duties to Plaintiffs and their clients to maintain the secrecy of the information.

96.     BMO used the trade secret information provided by Bappert and, at the time BMO used the trade secret information that Bappert had provided, BMO knew and/or had reason to know that Bappert had acquired the trade secret information during the course of his employment with the Company, under circumstances giving rise to contractual and fiduciary duties to maintain the secrecy of the information and limit its use.

97.     As a consequence of the foregoing, 1834 has suffered and will continue to suffer irreparable harm, injury and loss.  Under the DTSA, actual or threatened misappropriation can be enjoined.  If not enjoined, 1834 will continue to suffer irreparable harm.

98.     In addition, or in the alternative, as a direct and proximate result of the above, 1834 has suffered damages (exclusive of interest, costs, and fees) in excess of $1.5 million, in an amount to be proven at trial.

**COUNT II**
**VIOLATION OF THE ILLINOIS TRADE SECRETS ACT**
**(Against Bappert and BMO)**

99.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 81 of this Complaint, as and for this Paragraph 99.

100.     Defendants' actions, as described above, constitute violations of one or more provisions of the ITSA, 765 ILCS 1065/1, *et seq*.

101.     The trade secret information to which Bappert had access and which came into his possession includes, but is not limited to, financial information (customers' account information; customers' investment strategies, goals, and account history; portfolio and asset management plans, methods, and formulas developed for customers), business information (customers' contact information, their status as clients of 1834, and their financial needs, preferences, risk tolerances, income sources), and compilations of such information (customer lists). These trade secrets are described in greater detail, *supra*.

102.     1834 is the owner of that trade secret information because it is the legal entity in which rightful legal or equitable title to the trade secrets are reposed, by virtue of, *inter alia*, customer account agreements, and financial services regulations (e.g., Regulation S-P) regarding the use, retention, and protection of confidential customer information.

103.     1834 expended substantial time, energy, money and ingenuity in compiling this information based on its own efforts and communications with clients, prospective clients, and others.

104.     The trade secrets derive independent economic value and benefit from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic benefit from the disclosure or use of the information by using such information to poach 1834's valuable clients.

105.     1834 has taken reasonable measures to keep this information secret. As described more fully above, the Company has promulgated privacy and confidentiality policies, it has implemented both electronic and physical protections to keep the information secret, and it requires employees with access to the information to sign confidentiality agreements.

106. 1834 communicated these trade secrets to Bappert in confidence.

107. As set forth above, Bappert (and BMO by virtue of its employment of Bappert and its actions of obtaining client information from him) misappropriated, threaten to misappropriate, or inevitably will misappropriate 1834's trade secrets by, among other thing, disclosing the identities of 1834's clients and their contact information to BMO, and then using that information to unfairly compete with 1834. Bappert did so without the express or implied consent of the Company.

108. At the time of his disclosure and use, Bappert: (a) knew that his knowledge of the trade secret information was acquired by him under circumstances giving rise to contractual and fiduciary duties to maintain the secrecy of the trade secret information and limit its use, and (b) his disclosure to BMO, or his use on his own accord or on behalf of BMO, constituted a breach of his contractual and fiduciary duties to maintain the secrecy of that confidential information, not disclose it to anyone other than Plaintiffs, and not use it for own benefit or for the benefit of any other person or entity (other than Plaintiffs).

109. Bappert intended to convert, or inevitably will convert, the trade secrets to the economic benefit of himself and BMO, without 1834's consent, for use while at BMO. Bappert and BMO can obtain economic value for the disclosure and use of 1834's trade secrets, for example, by utilizing the information therein to solicit, attempt to induce, and induce 1834's clients to switch their business from 1834 to BMO.

110. BMO acquired, received and possesses, or inevitably will acquire, receive and possess, the trade secrets, knowing same to have been misappropriated without 1834's authorization and in violation of Bappert's contractual commitments and other legal duties to the Company.

111. At the time BMO acquired the trade secret information from Bappert, BMO knew and/or had reason to know that Bappert's use and disclosure of that information to (and for the benefit of) BMO constitutes: (i) intellectual property theft by Bappert, (ii) a breach by Bappert of his contractual and fiduciary duties to Plaintiffs and their clients to maintain the secrecy of the information, and (iii) an inducement by BMO of Bappert's breach of his contractual and fiduciary duties to Plaintiffs and their clients to maintain the secrecy of the information.

112. BMO used the trade secret information provided by Bappert and, at the time BMO used the trade secret information that Bappert had provided, BMO knew and/or had reason to know that Bappert had acquired the trade secret information during the course of his employment with the Company, under circumstances giving rise to contractual and fiduciary duties to maintain the secrecy of the information and limit its use.

113. As a consequence of the foregoing, 1834 has suffered and will continue to suffer irreparable harm, injury and loss.

114. Pursuant to the ITSA, actual or threatened misappropriation may be enjoined. Unless enjoined by this Court, Defendants will continue to use 1834's trade secret information to unfairly compete and enjoy commercial advantage that they would not have but for their misappropriation.

115. In addition, or in the alternative, as a direct and proximate result of the above, 1834 has suffered damages (exclusive of interest, costs, and fees) in excess of $1.5 million, in an amount to be proven at trial.

116. Further, the acts and conduct of Defendants were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

<u>COUNT III</u>
BREACH OF CONTRACT
(Against Bappert)

117. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 116 of this Complaint, as and for this Paragraph 117.

118. Bappert breached the restrictive covenants found in his Award Agreement.

119. The Award Agreement is a valid contract. ONB offered Bappert an ownership interest in ONB in exchange for Bappert agreeing to the restrictive covenants contained in the Award Agreement. On April 5, 2021, Bappert executed the Award Agreement, thereby accepting equity ownership interest in ONB, and agreeing to those restrictive covenants.

120.    1834, as the wholly-owned subsidiary of ONB that employed Bappert, is an intended third-party beneficiary of the Award Agreement.  Indeed, the benefits of the contract are direct to the Company (and incidental to ONB).

121.    ONB fully performed under the Award Agreement by virtue of allowing Bappert's stock to fully vest.  Because ONB fully performed under the Award Agreement, so too did third-party beneficiary 1834.

122.    The restrictive covenants in the Award Agreement are enforceable.  The restraints are no greater than required for the protection of a business interest of Plaintiffs.'  The restraints do not impose an undue hardship on Bappert.  And the restraints are not injurious to the public.

123.    After joining BMO, Bappert sent announcement notices to some of the clients he previously serviced at 1834.  Bappert also called clients he previously serviced at 1834.

124.    By sending written "announcements" to Old National clients and calling them after he joined BMO, Bappert violated the non-solicitation provision of the Award Agreement, in which he agreed not to "solicit, call upon, contact, [or] sell to … any clients or customers" of Old National.  (Ex. A at pp. 6-7, ¶ 12(d)).

125.    By doing so, Bappert also violated the confidentiality provision of the Award Agreement, in which he agreed not to "use … any Confidential Information for the benefit of a party other than [Old National]" or "provid[e] the name or Confidential Information about a client or customer" of Old National to his subsequent employer.  (Ex. A at pp. 5, 7, ¶¶ 12(b),12(d)).  The identities and contact information of 1834 clients are "Confidential Information" which Bappert was prohibited from using on BMO's behalf.

126.    In addition, because of Bappert's breaches of these restrictive covenants, five (5) client households transferred $40 million of their account assets from Old National to BMO.  By accepting their business, Bappert violated the non-accept provision of the Award Agreement, in which he agreed not to "accept any business from any such client or customer, which business involves services or products of any kind that are offered or provided by [Old National]" or "perform services for or contract with any clients or customers" of Old National.  (Ex. A at pp. 6-7, ¶ 12(d)).

127.     As a direct and proximate result of the above, Plaintiffs have suffered damages (exclusive of interest, costs, and fees) in excess of $1.5 million, in an amount to be proven at trial.

<u>COUNT IV</u>
CIVIL CONSPIRACY / AIDING-AND-ABETTING LIABILITY
(Against BMO)

128.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 127 of this Complaint, as and for this Paragraph 128.

129.     As set forth above, Bappert performed wrongful acts that caused Plaintiffs injury.  In particular he misappropriated Plaintiffs' trade secrets, violated his contractual duties to Plaintiffs, and violated his other legal duties to Plaintiffs.

130.     BMO aided and abetted Bappert in these wrongful acts.

131.     On information and belief, BMO made an agreement with Bappert – prior to the start of his employment at BMO – to aid, abet, assist, and participate in Bappert's unlawful misappropriation of the Company's trade secret information and breach of his contractual obligations and other legal duties to Plaintiffs.

132.     Pursuant to and in furtherance of that conspiracy, Bappert did, in fact and overtly, misappropriate the Company's trade secrets, and breach his contractual and other obligations to Plaintiffs, as described above.

133.     BMO aided Bappert with resources, administrative and office support, and financial compensation in connection with, and for his role in misappropriating the Company's trade secret information and breaching his contractual obligations and other legal duties to Plaintiffs.

134.     BMO was regularly aware of its role in the tortious activity at the time it provided assistance.  For example, even after Plaintiffs sent BMO a cease and desist letter notifying BMO of Bappert's obligations, BMO still assisted Bappert in onboarding clients from 1834, despite that it was in contravention of the non-accept provision in Bappert's Award Agreement.

135.     As a direct and proximate result of the above, Plaintiffs have suffered damages (exclusive of interest, costs, and fees) in excess of $1.5 million, in an amount to be proven at trial..

136.    Because BMO's conduct was willful and malicious, 1834 will be entitled to punitive damages.

**COUNT V**
**TORTIOUS INTERFERENCE WITH CONTRACTS**
**(Against BMO)**

137.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 81 of this Complaint, as and for this Paragraph 137.

138.    BMO tortiously interfered with (a) the Award Agreement between Bappert and Plaintiffs; and (b) the contracts between 1834 and its clients.

139.    The Award Agreement is a valid contract.  ONB offered Bappert an ownership interest in ONB in exchange for Bappert agreeing to the restrictive covenants contained in the Award Agreement.  On April 5, 2021, Bappert executed the Award Agreement, thereby accepting equity ownership interest in ONB, and agreeing to those restrictive covenants.

140.    1834, as the wholly-owned subsidiary of ONB that employed Bappert, is an intended third-party beneficiary of the Award Agreement.  Indeed, the benefit of the contract is direct to the Company (and incidental to ONB).

141.    ONB fully performed under the Award Agreement by virtue of allowing Bappert's stock to fully vest.  Because ONB fully performed under the Award Agreement, so too did third-party beneficiary 1834.

142.    The restrictive covenants in the Award Agreement are enforceable.  The restraints are no greater than required for the protection of a business interest of Plaintiffs.'  The restraints do not impose an undue hardship on Bappert.  And the restraints are not injurious to the public.

143.    When 1834 begins an advisory relationship with a client, 1834 and the client enter into a contract.  This contract provides that 1834 will perform financial advisory services for the client, and it specifies how 1834 will and will not use the client's personal information.  These contracts are valid and enforceable.

144.    BMO was aware of these contractual relationships.

27

145.     As to the restrictive covenants in the Award Agreement, BMO was likely aware of these covenants when Bappert joined BMO.  Not only are these very common in the wealth management industry, but employers typically ask new hires for copies of any contracts that include restrictive covenants between the employee and the previous employer.  At the very least, BMO was aware of the restrictive covenants as of November 15, 2024, when Plaintiffs sent BMO the cease-and-desist letter.

146.     BMO was also aware of the contractual relationships between 1834 and its clients—every wealth management firm, like BMO itself, enters into a similar contractual relationship with its own clients.

147.     Nevertheless, BMO intentionally, and without justification: (a) induced Bappert to breach the confidentiality, non-solicitation, and non-accept covenants in the Award Agreement; and (b) induced Bappert to cause the Company to breach its contractual obligations to its customers to preserve and maintain the confidentiality of their information.

148.     In particular, BMO provided Bappert with encouragement, resources, administrative and office support, and financial compensation in connection with, and for, his role in interfering with 1834's contracts.

149.     As a direct and proximate result of BMO's improper inducement: (a) Bappert breached his stock award agreement with BMO; and (b) Bappert breached the Company's contractual obligations to its customers.

150.     Specifically, after joining BMO, Bappert sent announcement notices to some of the clients he previously serviced at 1834.  Bappert also called clients he previously serviced at 1834.

151.     By sending written "announcements" to Old National clients and calling them after he joined BMO, Bappert violated the non-solicitation provision of the Award Agreement, in which he agreed not to "solicit, call upon, contact, [or] sell to … any clients or customers" of Old National.  (Ex. A at pp. 6-7, ¶ 12(d)).

152.     By doing so, Bappert also violated the confidentiality provision of the Award Agreement, in which he agreed not to "use … any Confidential Information for the benefit of a party other than [Old National]" or "provid[e] the name or Confidential Information about a client or customer" of Old National

to his subsequent employer. (Ex. A at pp. 5, 7, ¶¶ 12(b),12(d)). The identities and contact information of 1834 clients are "Confidential Information" which Bappert was prohibited from using on BMO's behalf.

153.    In addition, because of Bappert's breaches of these restrictive covenants, five (5) client households transferred $40 million of their account assets from Old National to BMO. By accepting their business, Bappert violated the non-accept provision of the Award Agreement, in which he agreed not to "accept any business from any such client or customer, which business involves services or products of any kind that are offered or provided by [Old National]" or "perform services for or contract with any clients or customers" of Old National. (Ex. A at pp. 6-7, ¶ 12(d)).

154.    Further, by having divulged this information BMO and by having used this information to market his new role to 1834 clients, Bappert caused the Company to breach its contractual obligations to its customers regarding the preservation and maintenance of the confidentiality of their information.

155.    As a direct and proximate result of the above, Plaintiffs have suffered damages (exclusive of interest, costs, and fees) in excess of $1.5 million, in an amount to be proven at trial.

156.    Because BMO's conduct was willful and malicious, 1834 will be entitled to punitive damages.

## COUNT VI
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
#### (Against BMO)

157.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 81 of this Complaint, as and for this Paragraph 157.

158.    BMO tortiously interfered with 1834's reasonable expectation of continuing its longstanding and valid business relationships with its customers.

159.    BMO knew of the Company's expectations in this regard.

160.    BMO intentionally, and without justification, interfered with the Company's expectations by, among other things: (a) having Bappert contact 1834's clients, (b) having Bappert solicit 1834's clients, and (c) allowing Bappert to accept 1834's clients at BMO.

161.    This interference was wrongful because BMO was aware of Bappert's restrictive covenants, which prohibited him from contacting 1834's clients, soliciting 1834's clients, or accepting business from 1834's clients.

162.    As a direct and proximate result of BMO's intentional and unjustified interference, the Company was prevented from realizing its reasonable expectation of continuing its business relationships with Client C.&J.B., Client T&K.S., Client M&L.T., and Client C&M.H.

163.    As a direct and proximate result of the above, Plaintiffs have suffered damages (exclusive of interest, costs, and fees) in excess of $1.5 million, in an amount to be proven at trial.

164.    Because BMO's conduct was willful and malicious, 1834 will be entitled to punitive damages.

### COUNT VII
#### UNJUST ENRICHMENT
#### (Against BMO, Pled in the Alternative)

165.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 81 of this Complaint, as and for this Paragraph 165.

166.    Plaintiffs plead this count in the alternative to their breach of contract claims.

167.    BMO is unjustly retaining the benefit of its (and Bappert's) improper conduct. Specifically, BMO is generating and receiving asset management fees from the former customers of 1834 who transferred management of their account assets to BMO as a direct and proximate result of Bappert's improper and unauthorized contact with and solicitation of those customers, as well as his acceptance of their financial advisory business.

168.    BMO's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

169.    Accordingly, Plaintiffs are entitled to (a) disgorgement of all management fees and other revenue received by BMO from 1834 customers who have transferred their business to BMO; and (b) a constructive trust in favor of 1834 over all future revenue received or earned by BMO from these customers.

<u>**JURY DEMAND**</u>

170.    Plaintiffs demand a trial by jury of any and all claims triable by jury.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment against Defendants, jointly and severally, that includes:

A.    A temporary, preliminary, and permanent injunction:

    1.    Enjoining and restraining Bappert from soliciting, calling upon, or selling to any clients that he serviced or learned of while employed by 1834;

    2.    Enjoining and restraining Bappert from performing services for, contracting with, or accepting business from, any clients that he serviced or learned of while employed by 1834;

    3.    Enjoining and restraining BMO from performing services for, contracting with, or accepting business from, any clients that Bappert serviced or learned of while employed by 1834;

    4.    Enjoining and restraining Bappert from, directly or indirectly, using or disclosing any of 1834's confidential information or trade secrets;

    5.    Enjoining and restraining BMO from, directly or indirectly, using or disclosing any of the confidential information or trade secrets of 1834 that Bappert disclosed to it;

    6.    Enjoining and restraining Bappert and BMO from continuing to possess for any purpose 1834's confidential information, including, but not limited to the identities, contact information and financial information of 1834's clients or former clients;

    7.    Requiring Bappert and BMO to return to 1834 any and all records containing 1834's confidential information;

B.    Money damages, in an amount to be determined at trial;

C.    An award of punitive and exemplary damages, as allowed by law;

D.    The disgorgement of all management fees and other revenue received by BMO from 1834 customers who have transferred their business to BMO;

E.    A constructive trust in favor of 1834 over all future revenue received or earned by BMO from these customers;

F.    An award of pre- and post-judgment interest, as allowed by law;

G.    An award of attorneys' fees and costs; and

H.      Any such other and further relief as the Court deems just and proper.

Dated:  December 10, 2024                          Respectfully submitted,

                                                   **OLD NATIONAL BANCORP, and 1834**
                                                   **INVESTMENT ADVISORS CO., Plaintiffs**

                                                   By:   /s/ *Christopher S. Griesmeyer*
                                                           One of Their Attorneys

Christopher S. Griesmeyer (# 6269851)
Zachary P. Mulcrone (# 6300387)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph Street, Suite 2300
Chicago, Illinois  60606
Bus: (312) 428-2750
cgriesmeyer@grglegal.com
zmulcrone@grglegal.com

# EXHIBIT A

 **First Midwest Bancorp, Inc.**

February 17, 2021

MATTHEW          BAPPERT
1902 N COMMERCE ST
MILWAUKEE, WI 53212

RE:     Award Letter Agreement dated February 17, 2021;
        Restricted Stock Award 00005741
        Grant of Restricted Stock (the "Award Agreement")

Dear MATTHEW

On February 17, 2021(the "Grant Date"), pursuant to the First Midwest Bancorp, Inc. 2018 Stock and Incentive Plan (the "Stock and Incentive Plan"), the Compensation Committee (the "Compensation Committee") of the Board of Directors of First Midwest Bancorp, Inc. (the "Company") approved a grant to you of a restricted stock award (the "Award") as set forth in this Award Agreement. The Award is subject to the terms and conditions of the Stock and Incentive Plan, as currently in effect or as may be amended hereafter, which are incorporated herein by reference.

(1)     Award.

        (a) The Company hereby grants to you an Award of an opportunity to earn
            586
            shares of the Company's common stock, $0.01 par value per share ("Common Stock"), subject to the restrictions and other conditions set forth herein and in the Stock and Incentive Plan. Such shares are referred to in this Award Agreement as the "Restricted Shares." Subject to paragraphs (2), (3), (4), (5) and (6), Restricted Shares may not be sold, transferred, pledged, gifted, assigned or otherwise alienated or hypothecated. Within a reasonable time after the date of this Award, the Company shall instruct its stock transfer agent to establish a book entry account representing the Restricted Shares in your name effective as of the Grant Date, provided that the Company shall retain control of such account until the Restricted Shares have become vested in accordance with the Award.

        (b) As promptly as practical after the date on which a portion or all of the Restricted Shares vest under this Award Agreement, and after receipt of any required tax withholding under paragraph (8), the Company shall instruct the stock transfer agent to transfer the number of vested Restricted Shares (less any shares withheld in satisfaction of tax withholding obligations under paragraph (8), if any) to an unrestricted account over which only you (or, in the case of your death, your designated beneficiary or authorized representative) have control.

(2)     Restrictions; Vesting.

Except as otherwise provided in paragraphs (3) and (4), the Restricted Shares shall vest and become transferable only if you continue in the employment of the Company or any of its subsidiaries through the applicable vesting dates. The Restricted Shares will vest and become transferable as follows: (a) 50% will vest on February 17, 2023; and (b) the remaining 50% of the Award will vest on February 17, 2024.

**This Award Agreement constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.**

Page 2

(3)    <u>Termination of Employment</u>.

If your employment with the Company or any of its subsidiaries terminates prior to the full vesting of the Restricted Shares due to your Retirement, a Qualifying Termination, a Disability or your death, (i) the Period of Restriction will automatically terminate and all restrictions on any unvested Restricted Shares will lapse, (ii) all unvested Restricted Shares will become immediately vested and freely transferable in full, subject to withholding for taxes under paragraph (8) and the provisions of paragraph 1(b) shall apply, and (iii) all dividends credited to you pursuant to paragraph (7) will become payable to you.

If your employment with the Company or any of its subsidiaries is terminated prior to the full vesting of the Restricted Shares under circumstances that entitle you to severance benefits under an applicable employment agreement or severance plan (an "Involuntary Termination"), and you execute and deliver the applicable release and severance agreement related to such severance benefits, then (i) the Period of Restriction will terminate and all restrictions with respect to a pro-rata portion (as described below) of the unvested Restricted Shares will lapse, (ii) such pro-rata portion of the unvested Restricted Shares will become vested and freely transferable in full, subject to withholding for taxes under paragraph (8) and the provisions of paragraph 1(b) shall apply, and (iii) all dividends credited to you pursuant to paragraph (7) with respect to such pro-rata portion of the unvested Restricted Shares will become payable to you; provided that if your Involuntary Termination would also be a termination due to your Retirement or a Qualifying Termination, the provisions above in this paragraph (3) shall apply to you and not these provisions applicable to an Involuntary Termination. The pro-rata portion of the unvested Restricted Shares shall be equal to (A) the total number of Restricted Shares granted under this Award as set forth in paragraph (1) multiplied by a fraction, the numerator of which is the number of whole months from the Grant Date to the date of Involuntary Termination and the denominator of which is the number of months in the period from the Grant Date to the final scheduled vesting date set forth in paragraph (2), minus (B) the number of Restricted Shares which have vested prior to the Involuntary Termination pursuant to paragraph (2). Restricted Shares which remain unvested after application of this paragraph and all dividends credited to you pursuant to paragraph (7) with respect to such unvested Restricted Shares shall be immediately forfeited as of the date of Involuntary Termination, and all of your rights hereunder to those Restricted Shares and dividends shall terminate.

If your employment with the Company or any of its subsidiaries terminates for any other reason prior to the full vesting of the Restricted Shares, all unvested Restricted Shares and all dividends credited to you pursuant to paragraph (7) shall be immediately forfeited, and all of your rights hereunder and to this Award shall terminate.

For purposes of this Award Agreement, "Retirement" means termination of your employment with the Company or any of its subsidiaries for any reason (other than death or under circumstances constituting Cause) on or after the date you attain age 65.

Further, a "Qualifying Termination" shall have the meaning given to it in the Stock and Incentive Plan; provided that if you are not a party to an employment agreement, or covered by a severance plan, "Good Reason" shall mean the occurrence of any event, other than in connection with termination of your employment by the Company, which results in (A) a material diminution of your principal duties or responsibilities from those in effect immediately prior to a Change in Control, including, without limitation, a significant change in the nature or scope of your principal duties or responsibilities, such that your duties or responsibilities are inconsistent with those immediately prior to the Change in Control, and commonly (in the banking industry) considered to

be of lesser responsibility, or (B) a material diminution of your total compensation from that immediately prior to the Change in Control, or (C) you being required to be based at an office or location that is more than thirty-five (35) miles from your office or location immediately prior to the Change in Control. Notwithstanding the foregoing, in order for your resignation for Good Reason to occur, (x) you must provide written notice of the Good Reason event to the Company or its subsidiary within ninety (90) days after the initial existence of such event; (y) the Company or its subsidiary must not have cured such condition within thirty (30) days of receipt of your written notice or the Company or its subsidiary must have stated unequivocally in writing that it does not intend to attempt to cure such condition; and (z) you must resign from employment at the end of the period within which the Company or a subsidiary was entitled to remedy the condition constituting Good Reason but failed to do so.

For purposes of this Award Agreement, the determination of whether a termination of your employment is for a "Disability," for "Cause" or for "Good Reason" shall be determined in accordance with the Stock and Incentive Plan and this Award Agreement, unless you are a party to an employment agreement or covered by a severance plan, in which case such determination under your employment agreement or such severance plan will control.

(4)     Effect of Change in Control.

A Change in Control shall not, by itself, result in acceleration of vesting of the Restricted Shares, except as provided in the Stock and Incentive Plan.

(5)     Non-Transferability.

Subject to the terms of this Award Agreement, this Award is personal to you and, until vested and transferable hereunder, may not be sold, transferred, pledged, gifted, assigned or otherwise alienated or hypothecated, other than by will or by the laws of descent and distribution.

(6)     Securities Law Restrictions.

You understand and acknowledge that applicable securities laws, rules and regulations govern and may restrict your right to offer, sell or otherwise dispose of any vested Common Stock received under the Award.

*Executive Officers of the Company subject to the two (2) day reporting rules of Section 16(a) and short-swing profit recovery rules of Section 16(b) of the Securities Exchange Act of 1934 should consult with the Company's Corporate Secretary prior to selling any such vested Common Stock.*

Additional information regarding these laws, rules and regulations can be found in the Stock and Incentive Plan's "Summary Description" and the *First Midwest Bancorp, Inc. Policy on Trading Public Securities.*

(7)     Stockholder Rights.

Upon the effective date of the book entry of your Restricted Shares pursuant to paragraph (1), you shall have the right to vote the Restricted Shares represented by the Award.

In the event the Company declares the payment of a cash dividend, a stock dividend (as defined in Section 305 of the Internal Revenue Code of 1986, as amended (the "IRC")) or a stock split on the Common Stock with a record date occurring during the Award's Period of Restriction, you shall

Page 4

be credited with either a dollar amount equal to the amount of the cash dividends paid or the number of shares equal to the stock dividend or stock split with respect to the Restricted Shares held by you as of the close of business on the record date for such dividend or stock split, as the case may be. The Company will hold all such cash dividends until the Period of Restriction terminates, and such dividends shall become payable to you on each vesting date of the Award with respect to only the Restricted Shares that vest on such date. All shares issued to you in connection with a stock dividend or stock split shall be subject to the same restrictions on transferability as the Restricted Shares, and the Period of Restriction shall terminate with respect to such shares at the same time and in the same proportion that the Restricted Shares vest. Subject to the provisions of paragraphs (3) and (4), in the event your employment with the Company terminates prior to full vesting of the Award, cash dividends and shares issued in connection with a stock dividend or stock split held by the Company and credited to you that have not been paid or vested will be forfeited.

(8)     Withholding.

You shall pay all applicable federal, state and local income and employment taxes (including taxes of any foreign jurisdiction) that the Company is required to withhold at any time with respect to the Restricted Shares, which will generally occur (a) as the Restricted Shares (including shares issued in connection with a stock dividend or stock split) vest, (b) when cash dividends are actually paid to you at the time any Restricted Shares vest, or (c) as of the Grant Date if you file an election under Section 83(b) of the IRC. Withholding with respect to cash dividends will be paid through withholding from your next normal payroll check. Payment of withholding upon vesting of any Restricted Shares will be accomplished through withholding by the Company of Restricted Shares then vesting under this Award with a value equal to the minimum statutory withholding amount, or such greater amount as the Compensation Committee may authorize, provided the withholding of such greater amount does not result in adverse accounting consequences for the Company. Shares withheld as payment of required withholding shall be valued at Fair Market Value on the date such withholding obligation arises. Payment of withholding as a result of a Section 83(b) election must be made by you to the Company in cash or by delivering fully-vested then-owned shares of Common Stock with a Fair Market Value equal to the required withholding amount.

(9)     Tax Consequences.

Information regarding federal tax consequences of the Award can be found in the Stock and Incentive Plan's "Summary Description", and the document entitled "General Information Regarding Restricted Share Grants". You are strongly encouraged to contact your tax advisor regarding such tax consequences as they relate to you.

(10)    Employment; Successors.

Nothing herein confers any right or obligation on you to continue in the employment of the Company or any subsidiary or shall affect in any way your right or the right of the Company or any subsidiary, as the case may be, to terminate your employment at any time, subject to the terms of any employment agreement to which the Company and you may be parties. Nothing herein shall create any right for you to receive, or any obligation on the part of the Company to grant to you, any future Awards under the Stock and Incentive Plan. This Award Agreement shall be binding upon, and inure to the benefit of, any successor or assignee of the Company.

(11)    Conformity with the Stock and Incentive Plan.

(a) The Award is intended to conform in all respects with the Stock and Incentive Plan. Inconsistencies between the Stock and Incentive Plan and this Award Agreement shall be resolved in accordance with the provisions of this Award Agreement. By executing and returning the enclosed Confirmation of Acceptance of this Award Agreement, you agree to be bound by all the terms hereof and of the Stock and Incentive Plan. All capitalized terms used but not otherwise defined in this Award Agreement shall have the same definitions stated in the Stock and Incentive Plan.

(b) Any action taken or decision made by the Compensation Committee arising out of or in connection with the construction, administration, interpretation or effect of this Award Agreement or the Stock and Incentive Plan shall lie within the Compensation Committee's sole and absolute discretion, and shall be final, conclusive and binding on you and all persons claiming under or through you. This Award Agreement shall be binding upon your heirs, executors, administrators and successors.

(c) Except as otherwise provided in this Award Agreement, this Award Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware without reference to any choice of law rules thereof (whether of the State of Delaware or any other jurisdiction) that would cause the application of any laws of any jurisdiction other than the State of Delaware.

(12) <u>Confidentiality and Restrictive Covenants</u>.

You acknowledge and agree that the Award has been conditioned upon your compliance with (and no Restricted Shares shall vest or become transferable by you hereunder unless you have complied and continue to comply with) the provisions of this paragraph (12). In consideration of your eligibility to receive the Award contemplated by this Award Agreement and any cash award under the Company's Short Term Incentive Compensation ("STIC") Plan and by executing (in writing or by electronic means) the Confirmation of Acceptance endorsement of this Award Agreement, you further acknowledge and agree as follows:

(a) The Company or its subsidiaries or affiliates (collectively, the "Affiliated Group") have spent extensive time, effort and resources developing and maintaining personal contacts and relationships with clients and customers of, and training and maintaining a stable workforce at, the Affiliated Group, which, as a result or in furtherance of your employment with one or more members of the Affiliated Group, you have or will have knowledge of, access to or contact or dealings with. In addition, each member of the Affiliated Group has a legitimate and protectable interest in their respective clients, customers and employees with whom each member of the Affiliated Group has established significant business relationships; and

(b) During the period of your employment with any member of the Affiliated Group and at all times thereafter, you covenant and agree (i) not to, directly or indirectly, use or disclose any Confidential Information (as defined below) except in furtherance of your duties and responsibilities as an employee of a member of the Affiliated Group in the ordinary course of business, (ii) not to, directly or indirectly, use or disclose any Confidential Information for the benefit of a party other than a member of the Affiliated Group, and (iii) comply with all policies of the Affiliated Group relating to the use and disclosure of Confidential Information. For purposes of this Award Agreement, "Confidential Information" means any and all trade secrets or confidential, proprietary or nonpublic information (whether verbal, written, electronic or in any other medium and all copies thereof) of a member of the Affiliated Group or any of their clients or customers. Without limiting the generality of the foregoing, Confidential Information

Page 6

shall include, but not be limited to, financial information or data, business plans or strategies, planned products or services, records and analyses, client or customer plans or requirements, and the business or affairs of any member of the Affiliated Group or any of their respective clients or customers that any of them may reasonably regard as confidential or proprietary; and

(c) To the extent applicable law requires a finite duration, the foregoing restrictions on the disclosure or use of Confidential Information shall apply for a period of five (5) years following termination of your employment with any member of the Affiliated Group for any reason, unless such information qualifies as a trade secret under applicable state or federal law or Third-Party Confidential Information, in which case the foregoing restrictions shall continue for so long as the trade secrets remain secret and any member of the Affiliated Group remains obligated to protect the Third-Party Confidential Information. "Third-Party Confidential Information" means confidential and proprietary or private information received by any member of the Affiliated Group from customers or other third-party individuals or business entities in trust and confidence or pursuant to a duty of confidentiality. If you are requested or become legally compelled to make any disclosure that is otherwise prohibited by this paragraph (12), you agree to promptly notify the Company not less than fourteen (14) days prior to such disclosure so that the Company or another member of the Affiliated Group may seek a protective order or other appropriate relief if the Company or such member of the Affiliated Group deems such protection or remedy necessary. Subject to the foregoing, you may furnish only that portion of the Confidential Information that you are legally compelled or required by law to disclose. However, nothing in this paragraph (12), any other agreement between you and any member of the Affiliated Group or in any Affiliated Group policy applicable to you shall preclude you from providing a federal or state governmental, regulatory or administrative agency truthful information concerning a suspected violation of the law without disclosure (in advance or otherwise) to any member of the Affiliated Group. Notwithstanding anything herein to the contrary, under the Federal Defend Trade Secrets Act of 2016, an individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (i) is made (1) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to court order. Nothing herein is intended, or should be construed, to affect the immunities created by the Defend Trade Secrets Act of 2016; and

(d) During the period of your employment with any member of the Affiliated Group and thereafter, without interruption, for a period ending twelve (12) consecutive months after the last day of your employment with any member of the Affiliated Group, you covenant and agree not to, directly or indirectly, (i) for your own account or as an employee, officer, director, owner, partner, representative, agent or consultant of any financial institution, bank, corporation, limited liability company, partnership, firm, business, joint venture, group, sole proprietorship or other entity, solicit, call upon, contact, sell to, perform services for or contract with any clients or customers of a member of the Affiliated Group for the purpose of providing to such client or customer services or products of any kind that are offered or provided by a member of the Affiliated Group, (ii) act as an independent contractor in connection with any of the foregoing, (iii) assist any person, business, financial institution, bank or other entity in connection with any of the foregoing, or (iv) accept any business from any such client or

customer, which business involves services or products of any kind that are offered or provided by a member of the Affiliated Group. For purposes of this Award Agreement, the term "customer" means any person, business, entity, organization or government which is or was a client or customer of a member of the Affiliated Group at any time during the period of your employment with such member of the Affiliated Group, other than any client or customer which has ceased to do business with a member of the Affiliated Group at least six (6) months prior to the last day of your employment without any inducement, encouragement or involvement by you and which client or customer you had contact with, had access to, supervised others' contact with, or obtained Confidential Information concerning, as a result of your employment with the Company. Without limiting the generality of the foregoing, this restriction prohibits you from providing the name or Confidential Information about a client or customer of a member of the Affiliated Group to a subsequent employer or an employee of a subsequent employer for the purpose of that subsequent employer or employee of the subsequent employer contacting or soliciting any client or customer of a member of the Affiliated Group for the purpose of providing to such client or customer services or products of any kind that are offered or provided by a member of the Affiliated Group; and

(e) During the period of your employment with any member of the Affiliated Group and thereafter, without interruption, for a period ending twelve (12) consecutive months after the last day of your employment with any member of the Affiliated Group, you covenant and agree not to, directly or indirectly, (i) solicit, induce, recruit or encourage any employee of a member of the Affiliated Group to leave the employ of any such member of the Affiliated Group, (ii) assist any other person, business, financial institution, bank or other entity to do so, or (iii) hire any employee of a member of the Affiliated Group. For purposes of this Award Agreement, the term "employee" means any person who is or was an employee of a member of the Affiliated Group during the period of your employment with any member of the Affiliated Group and with respect to whom you had contact or supervisory responsibility or about whom you had access to and used Confidential Information related to their job, position, performance or advancement potential, other than a former employee who has not been employed by a member of the Affiliated Group for a period of at least six (6) months prior to the last day of your employment without any inducement, encouragement or involvement by you; and

(f) During the period of your employment with any member of the Affiliated Group and thereafter, without interruption, for a period ending twelve (12) consecutive months after the last day of your employment with any member of the Affiliated Group, you covenant and agree not to, directly or indirectly, make, cause to be made or publish any statement or disclosure (whether verbally, in writing or by electronic or other medium) that disparages or is otherwise negative about any member of the Affiliated Group or any employee, officer, director, client or customer of any member of the Affiliated Group or assist any other person, business or entity to do so; and

(g) During the period of your employment you shall use all property of any member of the Affiliated Group (including, but not limited to, all mobile telephones, computers, laptops, tablets, credit cards, access cards, keys and passwords) solely in furtherance of your employment with one or more members of the Affiliated Group and not in violation of any statute, law, rule or regulation or any policy of any member of the Affiliated Group. Upon your last day of employment, you shall cease using and shall return all of such property to a member of the Affiliated Group; and

(h) The restrictive covenants set forth in this paragraph (12) are independent of and in addition to the restrictive covenants set forth in any employment agreement and/or a Confidentiality and

Page 8

Restrictive Covenants Agreement ("CRCA") with the Company. The restrictive covenants set forth in the employment agreement and/or CRCA are and shall remain in full force and effect and binding upon you and, in the event of any conflict between the restrictive covenants set forth in this paragraph (12) and those set forth in the employment agreement and/or CRCA, the restrictive covenants set forth in the employment agreement and/or CRCA shall control. Without limiting the generality of the foregoing, the restrictive covenants set forth in this paragraph (12) shall be in full force and effect and binding upon you during your employment and following any termination of your employment with the Company or any of its subsidiaries or affiliates (regardless if your termination of employment occurs before or after a Change in Control or if such termination of employment is with or without Cause, by resignation for Good Reason or no reason, or otherwise) for the periods specified in this paragraph (12) and without regard to any geographic limitation; and

(i) If any provision, or part thereof, of this paragraph (12) shall be declared by a court to exceed the maximum time period or scope that the court deems to be enforceable, then the Company and you expressly authorize the court to modify such provision, or part thereof, so that it may be enforced to the fullest extent permitted by law; and

(j) In the event that you breach any of the covenants or agreements set forth in this paragraph (12) and/or any employment agreement and/or CRCA, you shall immediately forfeit all rights to the Award and the Restricted Shares and all unearned, unvested or unexercised awards under the Stock and Incentive Plan and the STIC Plan; and

(k) The validity, interpretation, construction and performance of this paragraph (12) shall be governed by the laws of the State of Illinois without giving effect to the conflict of law principles thereof. The exclusive venue for any litigation between you and the Company or any of its subsidiaries or affiliates for any dispute arising out of or relating to this Agreement shall be the state court located in Cook County, Illinois, or the federal district court located in Chicago, Illinois, and you hereby irrevocably consent to any such court's exercise of personal jurisdiction over you for such purpose; and

(l) The restrictions set forth in this paragraph (12) are reasonable and necessary for the protection of each member of the Affiliated Group's legitimate business interests, and do not impose any undue economic hardship on you or otherwise preclude you from gainful employment.

(13) <u>Regulatory Requirements</u>.

You also acknowledge and agree anything in this Award Agreement to the contrary notwithstanding, it is intended that, to the extent required, this Award and your receipt of Restricted Shares or any other amounts hereunder comply with the requirements of any legislative or regulatory limitations or requirements that are or may become applicable to the Company and this Award or payments made hereunder, including the Sarbanes-Oxley Act of 2002 and the Dodd-Frank Wall Street Reform and Consumer Protection Act, and any rules or regulations issued thereunder (collectively, the "Regulatory Requirements"), which limitations or requirements may include, but are not limited to, provisions limiting, delaying or deferring the issuance of the Restricted Shares or payments hereunder (including, but not limited to, under Section 409A of the IRC), requiring that the Company may recover (claw-back) incentive compensation in certain circumstances and precluding incentive arrangements, such as this Award, that encourage unnecessary or excessive risks that threaten the value of the Company, in each case within the meaning of the Regulatory Requirements, and only to the extent applicable to the Company and this Award. The application of this paragraph is intended to, and shall be interpreted, administered

and construed to, cause this Award to comply with the Regulatory Requirements and, to the maximum extent consistent with this paragraph and the Regulatory Requirements, to permit the operation of this Award in accordance with the terms and conditions hereof before giving effect to the provisions of this paragraph or the Regulatory Requirements.

(14)  General.

   (a) This Award Agreement and the Stock and Incentive Plan set forth the entire terms and conditions of the Award. No officer or employee of the Company is authorized to amend or modify the Award or this Award Agreement without the approval of the Compensation Committee, and any such amendment or modification of the Award or this Award Agreement shall be in writing and signed by an authorized officer of the Company and you. If any provision of this Award Agreement is found to be invalid or unenforceable, the remaining provisions hereof shall remain binding and in full force and effect.

   (b) If you breach or threaten to breach any of the covenants and agreements set forth in paragraph (12) hereof and the Company initiates any legal action against you and successfully enforces such covenants and agreements and/or obtains damages as a result of any breach of such covenants and agreements, the Company shall be entitled to payment and reimbursement from you of its reasonable attorney's fees and litigation costs (including on appeal) incurred in connection with that action.

   (c) You acknowledge and agree that the Company may suffer irreparable harm if you breach or threaten to breach any of the provisions of paragraph (12) hereof and that, in the event of your actual or threatened breach of paragraph (12), the Company may not have an adequate remedy at law. Accordingly, you agree that, in addition to any other remedies at law or in equity available to the Company for your actual breach or threatened breach of paragraph (12), the Company is entitled to specific performance and injunctive relief against you to prevent any such actual or threatened breach without the necessity of posting a bond or other security.

   (d) THE COMPANY AND YOU HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT TO A TRIAL BY JURY OF ANY DISPUTE UNDER OR ACTION RELATING TO THIS AWARD AGREEMENT AND AGREE THAT ANY SUCH DISPUTE OR ACTION SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

*  *  *

To confirm your understanding and acceptance of the Award granted to you and your agreement to be bound by the provisions of this Award Agreement and the Stock and Incentive Plan, please click "Accept" at the bottom of the screen on which you are reviewing this Award Agreement. You should also make your beneficiary designation election online in your E-Trade account regarding this Award. A copy of this Award Agreement should be retained for your permanent records. If you have any questions, please do not hesitate to contact the General Counsel and Corporate Secretary of First Midwest Bancorp, Inc. at (708) 831-7260.

## View Your Grant                                                          ✕

 **First Midwest Bank**

**Message From Your Company**
To confirm your understanding and acceptance of the Award granted to you
and your agreement to be bound by the provisions of this Award Agreement
and the 2018 Stock and Incentive Plan, please click the Accept button at the
bottom of the screen on which you are reviewing this Award Agreement.

### Grant Summary

| Grant Date | Number | Type | Price | Granted Qty. | Status |
|---|---|---|---|---|---|
| 02/17/2021 | 00005741 | RSA | $0.00 | 586 | Accepted 04/05/2021 |

### Grant Documents
2021RSA

                                                                    Done

# EXHIBIT B



Olivia Robinson
Counsel, AVP
Phone 812-468-0372
Fax 812-468-0399
Olivia.Robinson@oldnational.com

November 14, 2024

*Via Email and Certified Mail*

Matt Bappert
9132 222nd Ave
Salem, WI 53168

Matt Bappert
3155 N 124th St.,
Brookfield WI, 53005
Matthew.Bappert@BMO.com

## NOTICE TO CEASE AND DESIST

Dear Mr. Bappert,

The purpose of this letter concerns the restrictive covenants under your Restricted Stock Award Agreement ("the Agreement") with Old National Bank as successor by merger with First Midwest Bank ("Old National") that you agreed to on April 5, 2021. A copy of the Agreement is enclosed for your review.

In consideration of your employment at Old National, you had access to Old National's confidential information, including the names, addresses and financial information of its customers. Under Section 12 of the Agreement, you agreed to not use or disclose such confidential information after your separation of employment with Old National. In addition, you agreed not to, directly or indirectly, solicit Old National's customers for a period of twelve (12) months after your separation of employment with Old National.

As you know, shortly after your separation of employment on or around October 22, 2024, Old National sent you a letter reminding you of your post-contractual obligations under the Agreement, including the prohibition against solicitation of Old National's customers.

Old National is currently investigating claims arising out of your post-employment conduct. Specifically, Old National recently learned that you used its confidential information at your new employer, BMO Bank, and mailed letters to Old National customers in order to solicit business from them. This conduct is a blatant violation of your contractual obligations to Old National.

In light of these developments, Old National hereby demands that you immediately cease and desist in any use or disclosure of Old National's confidential information and any solicitation of

Old National's customers. If you fail to comply with the aforementioned demand, Old National will pursue any and all legal remedies available to it, including filing a lawsuit and seeking appropriate injunctive relief against you.

Sincerely,

Olivia Robinson
Counsel, AVP

Enclosure

cc: Sharon Haward-Laird, Esq. (w/ encl. via email: Sharon.HawardLaird@BMO.com)

 **First Midwest Bancorp, Inc.**

February 17, 2021

MATTHEW          BAPPERT
1902 N COMMERCE ST
MILWAUKEE, WI 53212

RE:     Award Letter Agreement dated February 17, 2021;
        Restricted Stock Award 00005741
        Grant of Restricted Stock (the "Award Agreement")

Dear MATTHEW

On February 17, 2021(the "Grant Date"), pursuant to the First Midwest Bancorp, Inc. 2018 Stock and Incentive Plan (the "Stock and Incentive Plan"), the Compensation Committee (the "Compensation Committee") of the Board of Directors of First Midwest Bancorp, Inc. (the "Company") approved a grant to you of a restricted stock award (the "Award") as set forth in this Award Agreement. The Award is subject to the terms and conditions of the Stock and Incentive Plan, as currently in effect or as may be amended hereafter, which are incorporated herein by reference.

(1)     <u>Award</u>.

    (a) The Company hereby grants to you an Award of an opportunity to earn 586 shares of the Company's common stock, $0.01 par value per share ("Common Stock"), subject to the restrictions and other conditions set forth herein and in the Stock and Incentive Plan. Such shares are referred to in this Award Agreement as the "Restricted Shares." Subject to paragraphs (2), (3), (4), (5) and (6), Restricted Shares may not be sold, transferred, pledged, gifted, assigned or otherwise alienated or hypothecated. Within a reasonable time after the date of this Award, the Company shall instruct its stock transfer agent to establish a book entry account representing the Restricted Shares in your name effective as of the Grant Date, provided that the Company shall retain control of such account until the Restricted Shares have become vested in accordance with the Award.

    (b) As promptly as practical after the date on which a portion or all of the Restricted Shares vest under this Award Agreement, and after receipt of any required tax withholding under paragraph (8), the Company shall instruct the stock transfer agent to transfer the number of vested Restricted Shares (less any shares withheld in satisfaction of tax withholding obligations under paragraph (8), if any) to an unrestricted account over which only you (or, in the case of your death, your designated beneficiary or authorized representative) have control.

(2)     <u>Restrictions; Vesting</u>.

Except as otherwise provided in paragraphs (3) and (4), the Restricted Shares shall vest and become transferable only if you continue in the employment of the Company or any of its subsidiaries through the applicable vesting dates. The Restricted Shares will vest and become transferable as follows: (a) 50% will vest on February 17, 2023; and (b) the remaining 50% of the Award will vest on February 17, 2024.

<u>**This Award Agreement constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.**</u>

Page 2

(3)     <u>Termination of Employment</u>.

If your employment with the Company or any of its subsidiaries terminates prior to the full vesting of the Restricted Shares due to your Retirement, a Qualifying Termination, a Disability or your death, (i) the Period of Restriction will automatically terminate and all restrictions on any unvested Restricted Shares will lapse, (ii) all unvested Restricted Shares will become immediately vested and freely transferable in full, subject to withholding for taxes under paragraph (8) and the provisions of paragraph 1(b) shall apply, and (iii) all dividends credited to you pursuant to paragraph (7) will become payable to you.

If your employment with the Company or any of its subsidiaries is terminated prior to the full vesting of the Restricted Shares under circumstances that entitle you to severance benefits under an applicable employment agreement or severance plan (an "Involuntary Termination"), and you execute and deliver the applicable release and severance agreement related to such severance benefits, then (i) the Period of Restriction will terminate and all restrictions with respect to a pro-rata portion (as described below) of the unvested Restricted Shares will lapse, (ii) such pro-rata portion of the unvested Restricted Shares will become vested and freely transferable in full, subject to withholding for taxes under paragraph (8) and the provisions of paragraph 1(b) shall apply, and (iii) all dividends credited to you pursuant to paragraph (7) with respect to such pro-rata portion of the unvested Restricted Shares will become payable to you; provided that if your Involuntary Termination would also be a termination due to your Retirement or a Qualifying Termination, the provisions above in this paragraph (3) shall apply to you and not these provisions applicable to an Involuntary Termination. The pro-rata portion of the unvested Restricted Shares shall be equal to (A) the total number of Restricted Shares granted under this Award as set forth in paragraph (1) multiplied by a fraction, the numerator of which is the number of whole months from the Grant Date to the date of Involuntary Termination and the denominator of which is the number of months in the period from the Grant Date to the final scheduled vesting date set forth in paragraph (2), minus (B) the number of Restricted Shares which have vested prior to the Involuntary Termination pursuant to paragraph (2). Restricted Shares which remain unvested after application of this paragraph and all dividends credited to you pursuant to paragraph (7) with respect to such unvested Restricted Shares shall be immediately forfeited as of the date of Involuntary Termination, and all of your rights hereunder to those Restricted Shares and dividends shall terminate.

If your employment with the Company or any of its subsidiaries terminates for any other reason prior to the full vesting of the Restricted Shares, all unvested Restricted Shares and all dividends credited to you pursuant to paragraph (7) shall be immediately forfeited, and all of your rights hereunder and to this Award shall terminate.

For purposes of this Award Agreement, "Retirement" means termination of your employment with the Company or any of its subsidiaries for any reason (other than death or under circumstances constituting Cause) on or after the date you attain age 65.

Further, a "Qualifying Termination" shall have the meaning given to it in the Stock and Incentive Plan; provided that if you are not a party to an employment agreement, or covered by a severance plan, "Good Reason" shall mean the occurrence of any event, other than in connection with termination of your employment by the Company, which results in (A) a material diminution of your principal duties or responsibilities from those in effect immediately prior to a Change in Control, including, without limitation, a significant change in the nature or scope of your principal duties or responsibilities, such that your duties or responsibilities are inconsistent with those immediately prior to the Change in Control, and commonly (in the banking industry) considered to

Page 3

be of lesser responsibility, or (B) a material diminution of your total compensation from that immediately prior to the Change in Control, or (C) you being required to be based at an office or location that is more than thirty-five (35) miles from your office or location immediately prior to the Change in Control. Notwithstanding the foregoing, in order for your resignation for Good Reason to occur, (x) you must provide written notice of the Good Reason event to the Company or its subsidiary within ninety (90) days after the initial existence of such event; (y) the Company or its subsidiary must not have cured such condition within thirty (30) days of receipt of your written notice or the Company or its subsidiary must have stated unequivocally in writing that it does not intend to attempt to cure such condition; and (z) you must resign from employment at the end of the period within which the Company or a subsidiary was entitled to remedy the condition constituting Good Reason but failed to do so.

For purposes of this Award Agreement, the determination of whether a termination of your employment is for a "Disability," for "Cause" or for "Good Reason" shall be determined in accordance with the Stock and Incentive Plan and this Award Agreement, unless you are a party to an employment agreement or covered by a severance plan, in which case such determination under your employment agreement or such severance plan will control.

(4)   Effect of Change in Control.

A Change in Control shall not, by itself, result in acceleration of vesting of the Restricted Shares, except as provided in the Stock and Incentive Plan.

(5)   Non-Transferability.

Subject to the terms of this Award Agreement, this Award is personal to you and, until vested and transferable hereunder, may not be sold, transferred, pledged, gifted, assigned or otherwise alienated or hypothecated, other than by will or by the laws of descent and distribution.

(6)   Securities Law Restrictions.

You understand and acknowledge that applicable securities laws, rules and regulations govern and may restrict your right to offer, sell or otherwise dispose of any vested Common Stock received under the Award.

*Executive Officers of the Company subject to the two (2) day reporting rules of Section 16(a) and short-swing profit recovery rules of Section 16(b) of the Securities Exchange Act of 1934 should consult with the Company's Corporate Secretary prior to selling any such vested Common Stock.*

Additional information regarding these laws, rules and regulations can be found in the Stock and Incentive Plan's "Summary Description" and the *First Midwest Bancorp, Inc. Policy on Trading Public Securities.*

(7)   Stockholder Rights.

Upon the effective date of the book entry of your Restricted Shares pursuant to paragraph (1), you shall have the right to vote the Restricted Shares represented by the Award.

In the event the Company declares the payment of a cash dividend, a stock dividend (as defined in Section 305 of the Internal Revenue Code of 1986, as amended (the "IRC")) or a stock split on the Common Stock with a record date occurring during the Award's Period of Restriction, you shall

Page 4

be credited with either a dollar amount equal to the amount of the cash dividends paid or the number of shares equal to the stock dividend or stock split with respect to the Restricted Shares held by you as of the close of business on the record date for such dividend or stock split, as the case may be. The Company will hold all such cash dividends until the Period of Restriction terminates, and such dividends shall become payable to you on each vesting date of the Award with respect to only the Restricted Shares that vest on such date. All shares issued to you in connection with a stock dividend or stock split shall be subject to the same restrictions on transferability as the Restricted Shares, and the Period of Restriction shall terminate with respect to such shares at the same time and in the same proportion that the Restricted Shares vest. Subject to the provisions of paragraphs (3) and (4), in the event your employment with the Company terminates prior to full vesting of the Award, cash dividends and shares issued in connection with a stock dividend or stock split held by the Company and credited to you that have not been paid or vested will be forfeited.

(8)     Withholding.

You shall pay all applicable federal, state and local income and employment taxes (including taxes of any foreign jurisdiction) that the Company is required to withhold at any time with respect to the Restricted Shares, which will generally occur (a) as the Restricted Shares (including shares issued in connection with a stock dividend or stock split) vest, (b) when cash dividends are actually paid to you at the time any Restricted Shares vest, or (c) as of the Grant Date if you file an election under Section 83(b) of the IRC. Withholding with respect to cash dividends will be paid through withholding from your next normal payroll check. Payment of withholding upon vesting of any Restricted Shares will be accomplished through withholding by the Company of Restricted Shares then vesting under this Award with a value equal to the minimum statutory withholding amount, or such greater amount as the Compensation Committee may authorize, provided the withholding of such greater amount does not result in adverse accounting consequences for the Company. Shares withheld as payment of required withholding shall be valued at Fair Market Value on the date such withholding obligation arises. Payment of withholding as a result of a Section 83(b) election must be made by you to the Company in cash or by delivering fully-vested then-owned shares of Common Stock with a Fair Market Value equal to the required withholding amount.

(9)     Tax Consequences.

Information regarding federal tax consequences of the Award can be found in the Stock and Incentive Plan's "Summary Description", and the document entitled "General Information Regarding Restricted Share Grants". You are strongly encouraged to contact your tax advisor regarding such tax consequences as they relate to you.

(10)    Employment; Successors.

Nothing herein confers any right or obligation on you to continue in the employment of the Company or any subsidiary or shall affect in any way your right or the right of the Company or any subsidiary, as the case may be, to terminate your employment at any time, subject to the terms of any employment agreement to which the Company and you may be parties. Nothing herein shall create any right for you to receive, or any obligation on the part of the Company to grant to you, any future Awards under the Stock and Incentive Plan. This Award Agreement shall be binding upon, and inure to the benefit of, any successor or assignee of the Company.

(11)    Conformity with the Stock and Incentive Plan.

Page 5

(a) The Award is intended to conform in all respects with the Stock and Incentive Plan. Inconsistencies between the Stock and Incentive Plan and this Award Agreement shall be resolved in accordance with the provisions of this Award Agreement. By executing and returning the enclosed Confirmation of Acceptance of this Award Agreement, you agree to be bound by all the terms hereof and of the Stock and Incentive Plan. All capitalized terms used but not otherwise defined in this Award Agreement shall have the same definitions stated in the Stock and Incentive Plan.

(b) Any action taken or decision made by the Compensation Committee arising out of or in connection with the construction, administration, interpretation or effect of this Award Agreement or the Stock and Incentive Plan shall lie within the Compensation Committee's sole and absolute discretion, and shall be final, conclusive and binding on you and all persons claiming under or through you. This Award Agreement shall be binding upon your heirs, executors, administrators and successors.

(c) Except as otherwise provided in this Award Agreement, this Award Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware without reference to any choice of law rules thereof (whether of the State of Delaware or any other jurisdiction) that would cause the application of any laws of any jurisdiction other than the State of Delaware.

(12)   <u>Confidentiality and Restrictive Covenants</u>.

You acknowledge and agree that the Award has been conditioned upon your compliance with (and no Restricted Shares shall vest or become transferable by you hereunder unless you have complied and continue to comply with) the provisions of this paragraph (12). In consideration of your eligibility to receive the Award contemplated by this Award Agreement and any cash award under the Company's Short Term Incentive Compensation ("STIC") Plan and by executing (in writing or by electronic means) the Confirmation of Acceptance endorsement of this Award Agreement, you further acknowledge and agree as follows:

(a) The Company or its subsidiaries or affiliates (collectively, the "Affiliated Group") have spent extensive time, effort and resources developing and maintaining personal contacts and relationships with clients and customers of, and training and maintaining a stable workforce at, the Affiliated Group, which, as a result or in furtherance of your employment with one or more members of the Affiliated Group, you have or will have knowledge of, access to or contact or dealings with. In addition, each member of the Affiliated Group has a legitimate and protectable interest in their respective clients, customers and employees with whom each member of the Affiliated Group has established significant business relationships; and

(b) During the period of your employment with any member of the Affiliated Group and at all times thereafter, you covenant and agree (i) not to, directly or indirectly, use or disclose any Confidential Information (as defined below) except in furtherance of your duties and responsibilities as an employee of a member of the Affiliated Group in the ordinary course of business, (ii) not to, directly or indirectly, use or disclose any Confidential Information for the benefit of a party other than a member of the Affiliated Group, and (iii) comply with all policies of the Affiliated Group relating to the use and disclosure of Confidential Information. For purposes of this Award Agreement, "Confidential Information" means any and all trade secrets or confidential, proprietary or nonpublic information (whether verbal, written, electronic or in any other medium and all copies thereof) of a member of the Affiliated Group or any of their clients or customers. Without limiting the generality of the foregoing, Confidential Information

Page 6

shall include, but not be limited to, financial information or data, business plans or strategies, planned products or services, records and analyses, client or customer plans or requirements, and the business or affairs of any member of the Affiliated Group or any of their respective clients or customers that any of them may reasonably regard as confidential or proprietary; and

(c) To the extent applicable law requires a finite duration, the foregoing restrictions on the disclosure or use of Confidential Information shall apply for a period of five (5) years following termination of your employment with any member of the Affiliated Group for any reason, unless such information qualifies as a trade secret under applicable state or federal law or Third-Party Confidential Information, in which case the foregoing restrictions shall continue for so long as the trade secrets remain secret and any member of the Affiliated Group remains obligated to protect the Third-Party Confidential Information. "Third-Party Confidential Information" means confidential and proprietary or private information received by any member of the Affiliated Group from customers or other third-party individuals or business entities in trust and confidence or pursuant to a duty of confidentiality. If you are requested or become legally compelled to make any disclosure that is otherwise prohibited by this paragraph (12), you agree to promptly notify the Company not less than fourteen (14) days prior to such disclosure so that the Company or another member of the Affiliated Group may seek a protective order or other appropriate relief if the Company or such member of the Affiliated Group deems such protection or remedy necessary. Subject to the foregoing, you may furnish only that portion of the Confidential Information that you are legally compelled or required by law to disclose. However, nothing in this paragraph (12), any other agreement between you and any member of the Affiliated Group or in any Affiliated Group policy applicable to you shall preclude you from providing a federal or state governmental, regulatory or administrative agency truthful information concerning a suspected violation of the law without disclosure (in advance or otherwise) to any member of the Affiliated Group. Notwithstanding anything herein to the contrary, under the Federal Defend Trade Secrets Act of 2016, an individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (i) is made (1) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to court order. Nothing herein is intended, or should be construed, to affect the immunities created by the Defend Trade Secrets Act of 2016; and

(d) During the period of your employment with any member of the Affiliated Group and thereafter, without interruption, for a period ending twelve (12) consecutive months after the last day of your employment with any member of the Affiliated Group, you covenant and agree not to, directly or indirectly, (i) for your own account or as an employee, officer, director, owner, partner, representative, agent or consultant of any financial institution, bank, corporation, limited liability company, partnership, firm, business, joint venture, group, sole proprietorship or other entity, solicit, call upon, contact, sell to, perform services for or contract with any clients or customers of a member of the Affiliated Group for the purpose of providing to such client or customer services or products of any kind that are offered or provided by a member of the Affiliated Group, (ii) act as an independent contractor in connection with any of the foregoing, (iii) assist any person, business, financial institution, bank or other entity in connection with any of the foregoing, or (iv) accept any business from any such client or

Page 7

customer, which business involves services or products of any kind that are offered or provided by a member of the Affiliated Group. For purposes of this Award Agreement, the term "customer" means any person, business, entity, organization or government which is or was a client or customer of a member of the Affiliated Group at any time during the period of your employment with such member of the Affiliated Group, other than any client or customer which has ceased to do business with a member of the Affiliated Group at least six (6) months prior to the last day of your employment without any inducement, encouragement or involvement by you and which client or customer you had contact with, had access to, supervised others' contact with, or obtained Confidential Information concerning, as a result of your employment with the Company. Without limiting the generality of the foregoing, this restriction prohibits you from providing the name or Confidential Information about a client or customer of a member of the Affiliated Group to a subsequent employer or an employee of a subsequent employer for the purpose of that subsequent employer or employee of the subsequent employer contacting or soliciting any client or customer of a member of the Affiliated Group for the purpose of providing to such client or customer services or products of any kind that are offered or provided by a member of the Affiliated Group; and

(e) During the period of your employment with any member of the Affiliated Group and thereafter, without interruption, for a period ending twelve (12) consecutive months after the last day of your employment with any member of the Affiliated Group, you covenant and agree not to, directly or indirectly, (i) solicit, induce, recruit or encourage any employee of a member of the Affiliated Group to leave the employ of any such member of the Affiliated Group, (ii) assist any other person, business, financial institution, bank or other entity to do so, or (iii) hire any employee of a member of the Affiliated Group. For purposes of this Award Agreement, the term "employee" means any person who is or was an employee of a member of the Affiliated Group during the period of your employment with any member of the Affiliated Group and with respect to whom you had contact or supervisory responsibility or about whom you had access to and used Confidential Information related to their job, position, performance or advancement potential, other than a former employee who has not been employed by a member of the Affiliated Group for a period of at least six (6) months prior to the last day of your employment without any inducement, encouragement or involvement by you; and

(f) During the period of your employment with any member of the Affiliated Group and thereafter, without interruption, for a period ending twelve (12) consecutive months after the last day of your employment with any member of the Affiliated Group, you covenant and agree not to, directly or indirectly, make, cause to be made or publish any statement or disclosure (whether verbally, in writing or by electronic or other medium) that disparages or is otherwise negative about any member of the Affiliated Group or any employee, officer, director, client or customer of any member of the Affiliated Group or assist any other person, business or entity to do so; and

(g) During the period of your employment you shall use all property of any member of the Affiliated Group (including, but not limited to, all mobile telephones, computers, laptops, tablets, credit cards, access cards, keys and passwords) solely in furtherance of your employment with one or more members of the Affiliated Group and not in violation of any statute, law, rule or regulation or any policy of any member of the Affiliated Group. Upon your last day of employment, you shall cease using and shall return all of such property to a member of the Affiliated Group; and

(h) The restrictive covenants set forth in this paragraph (12) are independent of and in addition to the restrictive covenants set forth in any employment agreement and/or a Confidentiality and

Page 8

Restrictive Covenants Agreement ("CRCA") with the Company. The restrictive covenants set forth in the employment agreement and/or CRCA are and shall remain in full force and effect and binding upon you and, in the event of any conflict between the restrictive covenants set forth in this paragraph (12) and those set forth in the employment agreement and/or CRCA, the restrictive covenants set forth in the employment agreement and/or CRCA shall control. Without limiting the generality of the foregoing, the restrictive covenants set forth in this paragraph (12) shall be in full force and effect and binding upon you during your employment and following any termination of your employment with the Company or any of its subsidiaries or affiliates (regardless if your termination of employment occurs before or after a Change in Control or if such termination of employment is with or without Cause, by resignation for Good Reason or no reason, or otherwise) for the periods specified in this paragraph (12) and without regard to any geographic limitation; and

(i) If any provision, or part thereof, of this paragraph (12) shall be declared by a court to exceed the maximum time period or scope that the court deems to be enforceable, then the Company and you expressly authorize the court to modify such provision, or part thereof, so that it may be enforced to the fullest extent permitted by law; and

(j) In the event that you breach any of the covenants or agreements set forth in this paragraph (12) and/or any employment agreement and/or CRCA, you shall immediately forfeit all rights to the Award and the Restricted Shares and all unearned, unvested or unexercised awards under the Stock and Incentive Plan and the STIC Plan; and

(k) The validity, interpretation, construction and performance of this paragraph (12) shall be governed by the laws of the State of Illinois without giving effect to the conflict of law principles thereof. The exclusive venue for any litigation between you and the Company or any of its subsidiaries or affiliates for any dispute arising out of or relating to this Agreement shall be the state court located in Cook County, Illinois, or the federal district court located in Chicago, Illinois, and you hereby irrevocably consent to any such court's exercise of personal jurisdiction over you for such purpose; and

(l) The restrictions set forth in this paragraph (12) are reasonable and necessary for the protection of each member of the Affiliated Group's legitimate business interests, and do not impose any undue economic hardship on you or otherwise preclude you from gainful employment.

(13) <u>Regulatory Requirements</u>.

You also acknowledge and agree anything in this Award Agreement to the contrary notwithstanding, it is intended that, to the extent required, this Award and your receipt of Restricted Shares or any other amounts hereunder comply with the requirements of any legislative or regulatory limitations or requirements that are or may become applicable to the Company and this Award or payments made hereunder, including the Sarbanes-Oxley Act of 2002 and the Dodd-Frank Wall Street Reform and Consumer Protection Act, and any rules or regulations issued thereunder (collectively, the "Regulatory Requirements"), which limitations or requirements may include, but are not limited to, provisions limiting, delaying or deferring the issuance of the Restricted Shares or payments hereunder (including, but not limited to, under Section 409A of the IRC), requiring that the Company may recover (claw-back) incentive compensation in certain circumstances and precluding incentive arrangements, such as this Award, that encourage unnecessary or excessive risks that threaten the value of the Company, in each case within the meaning of the Regulatory Requirements, and only to the extent applicable to the Company and this Award. The application of this paragraph is intended to, and shall be interpreted, administered

Page 9

and construed to, cause this Award to comply with the Regulatory Requirements and, to the maximum extent consistent with this paragraph and the Regulatory Requirements, to permit the operation of this Award in accordance with the terms and conditions hereof before giving effect to the provisions of this paragraph or the Regulatory Requirements.

(14) <u>General</u>.

    (a) This Award Agreement and the Stock and Incentive Plan set forth the entire terms and conditions of the Award. No officer or employee of the Company is authorized to amend or modify the Award or this Award Agreement without the approval of the Compensation Committee, and any such amendment or modification of the Award or this Award Agreement shall be in writing and signed by an authorized officer of the Company and you. If any provision of this Award Agreement is found to be invalid or unenforceable, the remaining provisions hereof shall remain binding and in full force and effect.

    (b) If you breach or threaten to breach any of the covenants and agreements set forth in paragraph (12) hereof and the Company initiates any legal action against you and successfully enforces such covenants and agreements and/or obtains damages as a result of any breach of such covenants and agreements, the Company shall be entitled to payment and reimbursement from you of its reasonable attorney's fees and litigation costs (including on appeal) incurred in connection with that action.

    (c) You acknowledge and agree that the Company may suffer irreparable harm if you breach or threaten to breach any of the provisions of paragraph (12) hereof and that, in the event of your actual or threatened breach of paragraph (12), the Company may not have an adequate remedy at law. Accordingly, you agree that, in addition to any other remedies at law or in equity available to the Company for your actual breach or threatened breach of paragraph (12), the Company is entitled to specific performance and injunctive relief against you to prevent any such actual or threatened breach without the necessity of posting a bond or other security.

    (d) THE COMPANY AND YOU HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT TO A TRIAL BY JURY OF ANY DISPUTE UNDER OR ACTION RELATING TO THIS AWARD AGREEMENT AND AGREE THAT ANY SUCH DISPUTE OR ACTION SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

\*   \*   \*

To confirm your understanding and acceptance of the Award granted to you and your agreement to be bound by the provisions of this Award Agreement and the Stock and Incentive Plan, please click "Accept" at the bottom of the screen on which you are reviewing this Award Agreement. You should also make your beneficiary designation election online in your E-Trade account regarding this Award. A copy of this Award Agreement should be retained for your permanent records. If you have any questions, please do not hesitate to contact the General Counsel and Corporate Secretary of First Midwest Bancorp, Inc. at (708) 831-7260.

## View Your Grant ✕

 **Message From Your Company**
To confirm your understanding and acceptance of the Award granted to you
and your agreement to be bound by the provisions of this Award Agreement
and the 2018 Stock and Incentive Plan, please click the Accept button at the
bottom of the screen on which you are reviewing this Award Agreement.

### Grant Summary

| Grant Date | Number | Type | Price | Granted Qty. | Status |
|---|---|---|---|---|---|
| 02/17/2021 | 00005741 | RSA | $0.00 | 586 | Accepted 04/05/2021 |

### Grant Documents
2021RSA

Done

# EXHIBIT C

**From:** Bradley, Jacob V. <Jacob.Bradley@quarles.com>
**Sent:** Wednesday, November 27, 2024 4:09:34 PM
**To:** Benjamin R. Prinsen <brp@kravitlaw.com>
**Cc:** Dawn M. Head <dmh@kravitlaw.com>
**Subject:** RE: Letter to Matthew Bappert

Hi Ben,

Sorry I missed your call today. We understand your requests for information. Our client is willing to share with you that he used public sources to locate contact information for 33 people to whom he sent an announcement. The announcement was not a solicitation for business. 32 of the recipients presumably received the announcement.

While our client reserves all of his rights to challenge the enforceability of the restrictive covenants in the February 17, 2021 Award Letter Agreement, our client maintains that he is and has been in full compliance with those covenants.

I think a phone call would help clarify this situation. I'm available (all times Central):
- Dec. 2: before 11:30a; 1:30p – 4p; 6p and after
- Dec. 3: before 11a; 12:30p – 7p
- Dec. 4: 10:30a – 2p; 2:30p – 5p
- Dec. 5: before 4p

Please let me know what works best for you and I'll send an invite,
Jake

---

**From:** Benjamin R. Prinsen <brp@kravitlaw.com>
**Sent:** Wednesday, November 27, 2024 1:01 PM
**To:** Bradley, Jacob V. <Jacob.Bradley@quarles.com>
**Cc:** Dawn M. Head <dmh@kravitlaw.com>
**Subject:** RE: Letter to Matthew Bappert

Jake,

Thanks for the email.

We have asked for information from BMO and Mr. Bappert about who he contacted, whether to send the "announcement notice" or otherwise, at the time of or following he separation from Old National. We have also asked for information as to who contacted Mr. Bappert following his separation from Old National. We need that information now.

Be advised that Old National has now suffered a significant loss with at least one client moving from Old National to BMO. We believe that this is a direct result of Mr. Bappert's violations, and we are preparing to take legal action. BMO's counsel stated that Mr. Bappert is no longer violating his restrictions, but it appears his misconduct has already had a direct impact on Old National.

I will try to give you a call at some point this afternoon.

Ben

_____

**Benjamin R. Prinsen**

ATTORNEY

**Kravit ▪ Hovel & Krawczyk, s.c.**
825 N. Jefferson, Milwaukee, WI 53202-3737
**414-271-7100** x272 | fax 414-271-8135
brp@kravitlaw.com | www.kravitlaw.com [kravitlaw.com]

*The information contained in this message is intended only for the personal and confidential use of the designated recipients named above. This message may be an attorney/client or attorney work product communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient: (1) You are hereby notified that you have received this document in error, and that any review, dissemination, distribution or copying of this message is strictly prohibited; (2) Please delete this email and destroy any copy. Thank you.*

---

**From:** Bradley, Jacob V. <Jacob.Bradley@quarles.com>
**Sent:** Tuesday, November 26, 2024 2:21 PM
**To:** Benjamin R. Prinsen <brp@kravitlaw.com>
**Cc:** Dawn M. Head <dmh@kravitlaw.com>
**Subject:** RE: Letter to Matthew Bappert

Good afternoon Ben,

As Andrew reported late last week, we represent Matt Bappert in this matter. Please direct all future communications regarding this matter to us.

I appreciate your patience as we've worked to get up-to-speed quickly on this one. Do you have time tomorrow to connect? I'm free 12:30p – 5p Central time. Otherwise, I have decent availability Dec. 2, 4-6 next week.

Jake

---

**From:** Schulkin, Andrew <Andrew.Schulkin@bmo.com>
**Sent:** Friday, November 22, 2024 5:35 PM
**To:** Benjamin R. Prinsen <brp@kravitlaw.com>
**Cc:** Dawn M. Head <dmh@kravitlaw.com>; Bradley, Jacob V. <Jacob.Bradley@quarles.com>
**Subject:** RE: Letter to Matthew Bappert

I wanted to confirm receipt of your e-mail. Quarles & Brady is representing Matt. I have copied Jake Bradley from Quarles on this message so that he can respond further.

---

**From:** Benjamin R. Prinsen <brp@kravitlaw.com>
**Sent:** Friday, November 22, 2024 12:05 PM
**To:** Schulkin, Andrew <Andrew.Schulkin@bmo.com>
**Cc:** Dawn M. Head <dmh@kravitlaw.com>
**Subject:** RE: Letter to Matthew Bappert

---

**External Email:** Use caution with links and attachments. | **Courriel externe :** Faites preuve de prudence en ce qui a trait aux liens et aux pièces jointes.

Mr. Schultkin,

I write in response to your email dated November 19, 2024.

We appreciate your acknowledgement of our communications and the litigation hold. We also appreciate the fact that BMO and Mr. Bappert recognize that Mr. Bappert has ongoing contractual and other legal obligations to Old National. While BMO may expect its employees to comply with their obligations, Mr. Bappert failed to do so here. You acknowledge that he reached out to clients after his employment with Old National ended, and it is clear from your communication that his intent was to solicit those clients for and on behalf of BMO. Mr. Bappert had no business reason to reach out to those clients, and there is certainly no "obligation as a Certified Financial Planner" that requires or allows Mr. Bappert to breach his contractual obligations to Old National. Those are Old National clients, not Mr. Bappert's clients, and Old National is more than capable of servicing their accounts.

In the interest of trying to avoid litigation here, we need BMO's and Mr. Bappert's cooperation in understanding the extent of Mr. Bappert's contacts with his clients. Please provide a complete list of any Old National clients he contacted, whether to send his "announcement notice" or otherwise, during or after his separation from Old National. Please also provide a complete list of any Old National clients that Mr. Bappert claims contacted him following his separation. To be clear, Old National is not waiving, releasing, or relinquishing any of its rights, claims, or interests. If, however, Mr. Bappert's contacts were as minimal and innocuous as you suggest, then BMO and Mr. Bappert should be willing to share that information.

You assert that "some Old National employees" have made false or misleading statements about Mr. Bappert to "people." It is not clear what employees or what people you are referring to. Please provide us with the identities of the Old National employees who supposedly made these "false and misleading" statements so that we can fully investigate the matter.

I trust that this communication will be shared with Mr. Bappert. Please have his personal counsel contact me in connection with this matter when he or she is retained.

As stated above, Old National reserves all rights and interests regarding this matter.

Sincerely,

Ben Prinsen

_____

**Benjamin R. Prinsen**
ATTORNEY

**Kravit ▪ Hovel & Krawczyk, s.c.**
825 N. Jefferson, Milwaukee, WI 53202-3737
**414-271-7100** x272 | fax 414-271-8135
brp@kravitlaw.com | www.kravitlaw.com

*The information contained in this message is intended only for the personal and confidential use of the designated recipients named above. This message may be an attorney/client or attorney work product communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient: (1) You are hereby notified that you have received this document in error, and that any review, dissemination, distribution or copying of this message is strictly prohibited; (2) Please delete this email and destroy any copy. Thank you.*

_____

**From:** Schulkin, Andrew <Andrew.Schulkin@bmo.com>
**Sent:** Tuesday, November 19, 2024 5:00 PM
**To:** Benjamin R. Prinsen <brp@kravitlaw.com>
**Subject:** Letter to Matthew Bappert

Dear Mr. Prinsen,

I am counsel for BMO Bank N.A. ("BMO"). I received a copy of your letter dated November 15, 2024 that was e-mailed to our employee Matt Bappert and our General Counsel, Sharon Haward-Laird, yesterday evening.

Mr. Bappert is aware of his legal obligations to Old National and plans to comply with them. BMO expects Mr. Bappert and all of our employees to comply with their contractual and other legal obligations to their former employers, and we communicate that expectation to them when they start at BMO.

As was requested in Olivia Robinson's October 22, 2024 letter to Mr. Bappert, he has not solicited any Old National clients or employees and has not shared any trade secrets with BMO. While he sent announcement notices to a small number of clients that he worked with at Old National so that they can contact him about their accounts if needed and so that he is in compliance with his obligations as a Certified Financial Planner, he is not going to contact any Old National customers during the remainder of his 12-month non-solicitation period.

Although I do not see a basis for Old National to file a claim against Mr. Bappert, BMO will put in place a legal hold to ensure that documents and data are preserved. I ask that Old National also preserve documents that relate to this matter. In addition to the categories of documents noted in your letter, please ensure that Old National does not delete or destroy any communications that Old National has had with its employees or customers regarding Mr. Bappert or any complaints about Old National that you have received from Mr. Bappert's clients. Old National should preserve all "documents" as defined in your letter and should take the same steps that you have requested of BMO to ensure that relevant documents are not deleted or destroyed.

Please be aware that we have been informed that some Old National employees have been providing false or misleading information about Mr. Bappert in response to questions about his departure. In particular, one Old National employee has told people that Mr. Bappert left the industry and started his own business. Neither of those things are true. Please ensure that Old National employees are not making false or defamatory statements about him going forward.

I anticipate that Mr. Bappert will soon have outside counsel representing him in connection with this matter. If so, I will have that attorney reach out to you. Until then, please contact me if you would like to discuss further.

Best regards,

**Andrew L. Schulkin**
Senior Counsel | Legal, Regulatory Compliance & Procurement | BMO Financial Group | 320 S. Canal Street – 7th Floor | Chicago IL 60606
(847) 440-6818 | andrew.schulkin@bmo.com

Out of Office:  November 27-29, December 24-30

-----------------------------------------
************************************************************************

Information provided in this email or any attachments is not an official transaction confirmation or account statement. This message is intended only for the exclusive use of the intended recipient(s) named herein and may contain information that is PRIVILEGED and/or CONFIDENTIAL. If you are not the intended recipient, you are hereby notified that any use, dissemination, disclosure or copying of this communication is strictly prohibited. If you have received this communication in error, please destroy all copies of this message and its attachments and notify us immediately.